UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

BO YOUNG CHA, Individually and on Behalf :    Civil Action No.
of All Others Similarly Situated,    :

                Plaintiff,    :    CLASS ACTION COMPLAINT

       vs.    :

KINROSS GOLD CORPORATION, TYE W.    :
BURT, PAUL H. BARRY, GLEN
MASTERMAN and KENNETH G. THOMAS, :

             Defendants.    :

--------------------------------------------------------- x

JUDGE ENGELMAYER

12 CIV 1203



RECEIVED
FEB 16 2012
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Kinross Gold Corporation ("Kinross" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Kinross between February 16, 2011 and January 17, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange located in this District.

## PARTIES

6.     Plaintiff Bo Young Cha, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Kinross during the Class Period and has been damaged thereby.

7.     Defendant Kinross, together with its subsidiaries, engages in mining and processing of gold ores.  The Company's gold production and exploration activities are carried out principally in the Americas, Africa, and the Russian Federation.  Kinross maintains its principal offices in Toronto, Canada.

8.     Defendant Tye W. Burt ("Burt"), at all relevant times, served as Kinross's President and Chief Executive Officer.

9.     Defendant Paul H. Barry ("Barry") has served as Kinross's President and Chief Financial Officer ("CFO") since March 31, 2011.  Prior thereto, Defendant Barry served as "an independent consultant."

10.     Defendant Glen Masterman ("Masterman"), at all relevant times, served as Kinross's Senior Vice President of Exploration.

11.     Defendant Kenneth G. Thomas ("Thomas"), at all relevant times, served as Kinross's Senior Vice President of Projects.

12.     Defendants Burt, Barry, Masterman and Thomas are collectively referred to herein as the "Individual Defendants."

13.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Kinross, were privy to confidential and proprietary information concerning Kinross, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Kinross, as discussed in detail below.  Because of their positions with Kinross, the Individual

- 2 -

Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Kinross's business.

15.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

16.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual

Defendants had a duty to promptly disseminate accurate and truthful information with respect to Kinross's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Kinross common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Kinross common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. During the Class Period, the scheme: (i) deceived the investing public regarding Kinross's business, operations and management and the intrinsic value of Kinross common stock; (ii) facilitated a $1 billion offering of Kinross debt securities; (iii) allowed the Individual Defendants and certain Company insiders to collectively sell their personally-held Kinross common stock for proceeds in excess of $19.7 million; and (iv) caused Plaintiff and members of the Class to purchase Kinross common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Kinross between February 16, 2011 and January 17, 2012, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

- 4 -

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Kinross common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Kinross or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Kinross;

(c)     whether the price of Kinross common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

- 5 -

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Defendant Kinross is engaged in gold mining and related activities, including exploration and acquisition of gold-bearing properties, the extraction and processing of gold-containing ore, and the reclamation of gold mining properties.  Kinross produces gold in the form of doré, a semi-pure alloy of gold, which is shipped to refineries for final processing.  The Company's gold production and exploration activities are carried out principally in Canada, the United States, the Russian Federation, Brazil, Ecuador, Chile, Ghana and Mauritania.

25.     On August 2, 2010, Kinross and Red Back Mining Inc. ("Red Back") announced that their respective Boards of Directors unanimously approved a merger, whereby Kinross acquired all of the outstanding common shares of Red Back that Kinross did not previously own.  Prior to this transaction, Kinross owned 9.3% of Red Back's outstanding common shares.

26.     The consideration paid to acquire Red Bank, including the cost of Kinross's prior interest in Red Bank, totaled $7.36 billion.  Approximately 70% of this amount, or $5.16 billion, represented goodwill, or an amount to which the consideration paid by Kinross exceeded the fair value of the net assets it acquired.  At the time of the acquisition, which closed in September 2010, the price of gold was approximately $1,275 per ounce.

27.     The acquisition of Red Bank expanded the Company's operations in West Africa, with Kinross obtaining a 100% interest in the Tasiast property in Mauritania, Africa and a 90% interest in the Chirano gold mine in Ghana.

28.     Following the acquisition of Red Bank, securities analysts following Kinross noted that the Tasiast property would serve as the Company's primary growth driver.  To that end, analysts noted that the Company was "focused firmly on the Tasiast expansion," as Kinross prepared to significantly accelerate development and exploration activities of the Tasiast property.

### Materially False and Misleading Statements
### Issued During the Class Period

29.     The Class Period begins on February 16, 2011.  On that date, Kinross issued a press release announcing its financial results for its 2010 fourth quarter and year ended, the periods ended December 31, 2010.  The press release stated that Kinross produced 676,635 and 2,334,104 gold equivalent ounces for the 2010 fourth quarter and year end, respectively.  With respect to Tasiant, the press stated "Tasiast reserves and resources grow significantly," stating, in pertinent part, as follows:[1]

> **Proven and probable mineral reserves at Tasiast increased to 7.6 million gold ounces**, measured and indicated mineral resources were 2.1 million gold ounces and inferred mineral resources increased to 8.6 million gold ounces.  **The Company has completed a scoping study for the Tasiast expansion project** based on a 16-year life for the expanded project with average annual production of approximately 1.5 million ounces at an average gold grade of approximately 2 g/t for the first eight full years of the expanded project.
>
> *          *          *
>
> **Fourth quarter production at Tasiast was approximately 48,000 gold equivalent ounces.**  Production was impacted negatively during the quarter by leaks in one of

---

[1]     Unless otherwise noted, all emphasis is added.

the two water supply lines, but this situation was resolved in early 2011 and full water supply to the site has been restored.

*         *         *

**Kinross ramped up drilling activities at the Tasiast site in Mauritania through the fourth quarter 2010.** As at December 31, 2010, proven and probable mineral reserves at Tasiast were 7.6 million ounces, measured and indicated mineral resources were 2.1 million ounces, and inferred mineral resources were 8.6 million ounces. **With a total of 25 drills currently active, the Company is continuing its aggressive exploration and engineering drilling campaign at Tasiast in 2011.**

**Kinross has completed a scoping study for the Tasiast expansion project,** based on a 16-year mine plan for the expanded project. During the first eight full years of operation, average annual production is expected to be approximately 1.5 million gold equivalent ounces at an average cost of sales per ounce of approximately $480-520, with an expected average gold grade of approximately 2 g/t, and expected average recoveries of 93%.

The proposed open pit mine will feed both the existing 8,000 tonne per day plant and an expansion plant. The proposed expansion plant is a conventional gold cyanidation plant, consisting of primary crushing, grinding, gravity separation, carbon-in-leach cyanidation and cyanide destruction, with a design throughput of approximately 60,000 tonnes per day.

[Footnotes omitted.]

Defendant Burt commented on the Company's results, stating, in pertinent part, as follows:

**Our aggressive exploration and technical work since acquiring Tasiast confirms our view of its potential to become one of the world's great gold mines. Gold grades are higher than expected** in the early years of production, the deposit continues to be open, reserves and resources have grown significantly, and we've completed a scoping study that helps to define the project's impressive magnitude. **Tasiast will be a cornerstone asset for Kinross as its production** expands to 1.5 million ounces, while averaging down company-wide production costs.

In 2010, Kinross' proven and probable gold reserves increased by 23%. Our production reached a new record with strong performance from our mines, and for the first time, annual revenue exceeded $3 billion while adjusted operating cash flow exceeded $1 billion. Margins averaged $683 per ounce in 2010, an increase of 29% year-over-year, compared with a 23% year-over-year increase in the average realized gold price per ounce.

In 2011, with a full year of output from our West African mines, we forecast production will increase to 2.5-2.6 million gold equivalent ounces, while we also expect higher costs as a result of increased energy and labour costs, and lower average grades. By 2015, we expect production to grow to 4.5-4.9 million ounces, as

our suite of new projects start up in 2013 and 2014.  With new studies completed at Tasiast, FDN, Lobo-Marte, and Dvoinoye, we are making significant and steady progress advancing the projects that give Kinross the best growth profile among senior gold producers.

[Footnote omitted.]

30.    Following the Company's 2010 fiscal fourth quarter and year end earnings announcement, Kinross held a conference call with analysts and investors to discuss the Company's earnings and operations.  Not surprisingly, on the conference call with analysts and investors, the Individual Defendants devoted a significant amount of their prepared remarks to Tasiast and made numerous positive statements about the property, including technical projects, studies and aggressive exploration confirming Kinross' due diligence about the property, its higher than expected grade of gold and the amount of its reserves.  For example:

Defendant Burt:

Overall, 2010 was a transformational year for Kinross.  We rationalized our portfolio, adding assets in North America and one of the world's fastest growing gold regions, West Africa.  **Just four months after closing the acquisition of Tasiast, the exploration and technical work we are conducting on the project continues to confirm the potential we saw during our due diligence.**

**Gold grades are higher than expected in the early years of production.  The deposit continues to be open.  Reserves and resources have grown significantly since November, and we've completed now a scoping study that helps define the magnitude of this project.  Tasiast will be a cornerstone asset for Kinross as it grows its production to 1.5 million annual ounces, while averaging down our company-wide production costs.**

\*        \*        \*

Turning to our development projects, we made significant progress in advancing each of our major growth prospects throughout the year.  **At Tasiast in Mauritania, we embarked on an accelerated exploration program since acquiring the project in late September.  We increased the number of drills to 25, completed over 60,000 meters of drilling in the fourth quarter, finished a scoping study on the expansion project, and dramatically increased Tasiast's known reserves and resources through fast tracking that drill program.  We've already started purchasing equipment for the expansion project, placing orders for a SAG mill, two ball mills and crushers.**

- 9 -

**At year-end 2010, Tasiast's proven and probable mineral reserves increased to 7.6 million ounces, M&I were 2.1 million ounces, and inferred resources increased to 8.6 million gold ounces.** Glenn will speak in more detail about our exploration work there, and our plans for 2011. **But I will say that our work on the project continues to conform -- to confirm, its great potential. Tasiast has completely lived up to our expectations, growing faster than anticipated, with indications that there is much more potential to be discovered as we continue our work on-site.**

**The scoping study just released proposes an expansion of the mine, with production reaching 1.5 million ounces per year over the first eight full years of operation, at an estimated cost of sales of approximately $4.80 to $5.20 per ounce. Tasiast will be one of the world's largest gold mines, and a significant contributor to Kinross' growth, while averaging down our Company-wide cost profile.**

*        *        *

At our newly acquired Tasiast mine in Mauritania, production in the fourth quarter was 48,000 ounces, as production was impacted by leaks in one of two water supply pipelines. We resolved the situation early in 2011, and full water supply has been restored to the site.

Defendant Masterman:

**Turning to Tasiast, we have added 3.9 million ounces to resource inventory at Tasiast since our last update in November,** and added 11 drills to the project in the fourth quarter of 2010. Three additional drills were contracted at the beginning of 2011, bringing the **total number of active drills at site to 25.**

We completed approximately 64,000 meters of drilling in the West Branch area to target deeper extensions of the green-schist zone and to extend green-schist star mineralization close to the surface. We also installed a new sample preparation facility in Nouakchott in order to expedite sample analytical timelines.

**As a result of accelerating exploration efforts, we have significantly increased reserves and resources. As of December 31, 2010, proven and probable reserves at Tasiast increase to 7.6 million ounces. Measured indicated resources are 2.1 million ounces and inferred resources increased to 8.6 million ounces. We upgraded 2.6 million ounces of resource to reserves and added 3.5 million ounces to inferred resources since the update in November.**

*        *        *

**In 2011, we will be conducting three parallel exploration programs at Tasiast. Resource expansion and definition drilling, exploration near the mine, and exploration of the Tasiast trend beyond the 8 kilometer mine corridor. This**

involves 130,000 meters of drilling on West Branch, focusing on infill and resource expansion of the green-schist zone, which remains open down-plunge.

Defendant Thomas:

At year-end, **we completed the scoping study for Tasiast, which envisions an expanded open-pit operation, with a milling capacity of 68,000 tons per day,** comprised of 8,000 tons per day from the existing operation and 60,000 tons per day from a new processing plant. The new plant is a conventional gold cyanidation plant consisting of primary crushing, grinding, gravity separation, carbon and leach cyanidation and cyanide disruption.

The study is based on a 16-year mine plan for the expanded project, which forecasts 1.5 million gold equivalent ounces of annual production at an average gold rate of approximately 2 grams per ton, and averaging recoveries of approximately 93% in the first eight full years of operation. Over the same period, total cash costs are expected to be in the range of approximately $480 to $520 per ounce. **The project team is continuing to optimize its estimates for operating costs, which we included in the project feasibility study scheduled for completion in mid-2011.**

The scoping level estimate for initial pre-commissioning capital for the processing plant, mine fleet equipment and associated infrastructure is $1.8 billion, plus contingency of $400 million. Post start-up of the mill, we expect to make additional three purchases of approximately $500 million to sustain the full mining and stripping rate. We have ordered major processing equipment, including three crushers, one SAG ball mill and two ball mills, wraparound motors for the mills, and we are in advanced discussion with suppliers regarding the purchase of trucks for the expanded mining fleet. We have retained an international EPCM joint venture firm for the project feasibility study and basic engineering.

31.     These statements by Defendants, and others like them, left investors with only one conclusion - - -the outlook for Kinross's Tasiast operations was very positive. In fact, during the question and answer session of the conference call, Defendant Masterman indicated that during 2011, the Company would focus fervently on a exploratory drilling campaign at Tasiast. The following exchange took place:

John Bridges - JPMorgan Chase & Co. – Analyst:

You've got a lot of boots, or maybe sandals on the ground there now, and there was a comment there about step-out drilling and other opportunities. Could you just give us a taste as to what else you are finding on the property?

Defendant Burt:

Yes, thanks John, I will ask Glen to give us just an overview of what we are expecting for this year and what maybe some of the geochem sampling results have been.

Defendant Masteman:

Sure, Tye. John, the -- I'd draw your attention to the -- I guess to the three-pronged strategy and approach for exploration at Tasiast this year. **The first is the infill drilling and expansion of the Greenshire zone in the West Branch area. So there will be a strong focus on that in 2011 going forward**. In addition to that, we will be driving exploration around the -- or beneath the pits, along strike.

This is within the 8-kilometer mine corridor at Tasiast. We will continue -- so we will be driving a program along that additional 5 kilometers of strike beyond the West Branch.

And a third element of the program, or strategy, is to advance our district exploration of geochem and geophysics targets in the 70-kilometer belt beyond the main mine corridor. **And there are a number of these quality targets that we know about already, and we have an aggressive reconnaissance drilling exploration program to move these along** in the future.

32.      On March 1, 2011, *Dow Jones Factiva* reported the following about Kinross, stating,

in part:

India, March 1 -- **Kinross Gold Corp. anticipates doubling its annual gold output over the next few years as the company brings new projects on line headed by the Tasiast mine** acquired in a merger last year the company's chief executive said Monday. **Kinross anticipates the highest growth rate in our peer group said Tye Burt president and chief executive officer**. He was speaking at the BMO Capital Markets Global Metals and Mining Conference in Hollywood Fla. The company gained a presence in West Africa when it acquired Red Back Mining for $7.1 billion last year. The assets were the Tasiast mine in the African nation of Mauritania as well as the Chirano mine in Ghana. Tasiast was considered the biggest nugget with Burt terming it one of the world's best gold properties. In its fourth quarter earnings report the company listed total production of 2.33 million ounces for 2010.

33.      On March 7, 2011, Kinross issued a press release announcing the appointment of

Defendant Barry as the Company's Executive Vice-President and CFO. Defendant Barry replaced

Thomas M. Boehlert, who left the Company "by mutual agreement to pursue other opportunities."

34.      On March 28, 2011, Kinross, in advance of an upcoming analyst and investor tour of

its recently acquired West African assets, issued a press release providing an update on its

- 12 -

exploration activity and expansion plans associated with the Tasiast property. Among other things, Kinross's update represented that:

- Its aggressive drilling campaign at Tasiast continues, with 26 rigs currently active and 70,000 metres drilled since the beginning of the year.

- Results from drilling at Tasiast continued to meet or exceed expectations.

- Reconnaissance drilling yielded encouraging gold results at two different targets along the Tasiast trend outside of the main Tasiast deposit.

- The Tasiast expansion feasibility study was 36% complete and remained on schedule.

- Procurement of a mining fleet for the Tasiast expansion project had commenced.

35.     On March 31, 2011, Kinross issued a press release announcing that it had amended its unsecured revolving credit facility, which included increasing the amount available under the facility from $600 million to $1.2 billion.

36.     On April 7, 2011, Kinross filed its 2010 Annual Report with the System for Electronic Document Analysis and Retrieval ("SEDAR"). The 2010 Annual Report represented that the Company's drilling campaign added "significant new reserves and resources" and that Kinross increased its proven and probable reserves associated with the Tasiast property, stating, in pertinent part, as follows:

> **Tasiast is a once-in-a-lifetime gold deposit and is destined to become one of the world's largest producing gold mines. Our aggressive drilling campaign added significant new reserves and resources by year-end,** and we expect the resource to continue growing. **Our scoping study, completed in December 2010, envisages a 16-year mine plan for the expanded project with average annual production of approximately 1.5 million ounces for the first eight full years**.
>
> With only eight kilometres of Tasiast's 80-kilometre greenstone belt explored to date - and with a geologic architecture similar to sites of major gold deposits in settings such as Kalgoorlie in Australia and Timmins in Canada - we believe there is further potential for Tasiast to become an entire gold producing region.

*       *       *

Located in a highly prospective, under-explored area with no geographic constraints to expansion, the Tasiast expansion project in Mauritania provides unrivalled potential for growth. Kinross continues to advance Tasiast on an accelerated timeline. **At year-end 2010, Kinross increased Tasiast's proven and probable reserves to 7.6 million gold ounces**. With 26 drills active on site, Kinross expects to further expand the deposit's reserves in 2011. **The expansion project scoping study, completed in late 2010, envisions average annual production of approximately 1.5 million gold ounces per year for the first eight years of production. Mill capacity is expected to increase from 8,000 to 68,000 tonnes per day**, dramatically increasing the size and scope of current mining operations. **A feasibility study is expected to be completed in mid-2011**, with start-up of the expansion project targeted for the first half of 2014.

37.     On May 3, 2011, Kinross issued a press release announcing its financial results for its 2011 first quarter, the period ended March 31, 2011. The Company reported revenue for the quarter of $937.0 million and net earnings attributable to common shareholders of $255.5 million. The press release also announced that Kinross's production in the first quarter of 2011 was 642,857 gold equivalent ounces and that it increased its full-year production forecast from 2.5 - 2.6 million to 2.6 - 2.7 million attributable gold equivalent ounces. In addition, the press release indicated that Tasiant's feasibility study was more than 60% complete, drilling results to date had met or exceeded expectations, and that "reconnaissance drilling" has yielded "encouraging" results, stating, in pertinent part, as follows:

> **The Tasiast feasibility study is 62% complete and remains on schedule for completion in mid-2011.** A total of 135,000 metres have been drilled since the beginning of the year and **results continue to meet or exceed expectations. Reconnaissance drilling has yielded encouraging results at two different targets** along the Tasiast trend outside of the main Tasiast deposit.

> \*       \*       \*

> In West Africa, **first quarter production at Tasiast increased by 7% over the fourth quarter**. Production was negatively impacted by a failure of the elution column in late January; this impact was minimized by expedited deployment of a replacement column which was fully operational by mid-February.

> \*       \*       \*

- 14 -

**Kinross is continuing its aggressive drilling campaign at Tasiast with 17 core and 9 reverse circulation rigs in operation** on a 24-hour per day schedule. As of the end of March 2011, **definition drilling was approximately 95% complete at West Branch, geotechnical drilling was approximately 80% complete, and condemnation work was approximately 40% complete.** A total of 135,000 metres have been drilled since the beginning of the year, with 65,000 metres completed at West Branch since the last of the holes included in Kinross' 2010 year-end mineral reserve and mineral resource estimate, which was published February 16, 2011.

**Results from the infill and mineral resource expansion campaign continue to meet or exceed expectations.** In addition, **reconnaissance drilling has encountered encouraging results** along the trend outside of the main Tasiast deposit, at the Charlize target, located 15 km south of Tasiast, and the C67 target, located 5 km north of Tasiast. **The feasibility study for the Tasiast expansion is 62% complete and remains on schedule for completion in mid-2011.** Geotechnical investigations of the tailings dam site and plant site are at a feasibility level of definition. An expansion of the existing camp is currently underway to accommodate the increasing number of operations personnel required to support the expansion project. In addition, a 500-bed camp for the initial phase of the expansion construction program is now out to tender. A new ADR (Adsorption, Desorption and Refining) plant and dump leach facility are under construction and are expected to be operational in the third quarter to treat oxide ore from Piment and West Branch.

Defendant Burt commented on the Company's results, stating, in pertinent part, as follows:

**Strong performance from our operations, new production from West Africa, and a robust gold price contributed to a 42% increase in revenue and an 81% increase in adjusted net earnings for Kinross.** Adjusted operating cash flow was $398 million, a 67% increase year-over-year. Production costs were lower than expected, despite rising energy and consumable prices industry-wide, and a margin increase of 29% continued to outpace the increase in the average gold price. As a result of increasing our Kupol interest to 100%, we have increased our full-year production guidance to 2.6-2.7 million ounces.

**We continue our aggressive campaign to define and advance mineral reserves and resources at Tasiast, with 26 drills turning around the clock. Results at the main deposit continue to fulfill our expectations, while encouraging results at other targets along the trend reinforce our belief that Tasiast has the potential to develop into a major gold producing district. We continue to make good progress advancing the Tasiast expansion and other growth projects which are expected to double our gold production from 2010 levels.** Commissioning of the third ball mill at Paracatu is on budget and on schedule, underground exploration decline development at Dvoinoye has begun, and construction of the portal high wall for the underground exploration decline at Fruta del Norte is underway.

[Footnote omitted.]

- 15 -

38.     Following the Company's 2011 fiscal first quarter earnings announcement, on May 3, 2011, Kinross held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants reiterated their positive statements about the Company and, in particular, the Tasiast property.  Defendants noted that Tasiast's aggressive exploration drilling program and its infill, engineering and definitional drilling methods, which generally provide detailed information about a mine's geology and gold ore distribution were proceeding as expected.  Defendants noted that infill drilling at Tasiast's West Branch site was 95% complete, the Company's expansion feasibility study at Tasiast was more than 60% complete and that Tasiast's exploration and drilling program was proceeding steadily that the results of such program had produced "encouraging" results.  For example:

Defendant Burt:

Speaking briefly to our growth projects, **we continue to make steady progress advancing the Tasiast expansion** and other projects.  **At Tasiast, our aggressive exploration and engineering drill program continues, with 26 rigs turning around the clock.**  While **the majority of drilling taking place right now is infill, engineering and definition drilling in support of the project's feasibility study,** we are continuing with that effort.  **Reconnaissance drilling has encountered encouraging gold results along the trend outside of the main Tasiast deposit, reinforcing our view that Tasiast has the potential to develop into an entire gold-producing district.**

*       *       *

Defendant Thomas:

Our aggressive drilling program at Tasiast continues, with 17 core and 9 reverse circulation rigs in operation on the 24-hour basis.  **As of the end of March, infill drilling at West Branch was approximately 95% complete, and geotechnical drilling was approximately 80% complete.**  A total of 135,000 meters have been drilled since the beginning of the year, with 65,000 meters completed at West Branch since the last of the drill holes in our 2010 year-end mineral reserve and mineral resource estimate.  **The feasibility study for the expansion is approximately 62% complete, and remains on schedule for completion in mid-2011.**

*       *       *

- 16 -

George Topping - Stifel Nicolaus – Analyst:

Okay, good.  And just moving on to Tasiast, on the Satellite deposit, Charlize and C67, could you lay out a plan for the exploration time line of those, when we can expect more news from those two?

*       *       *

Defendant Masterman:

George, we're -- **in the month of May, we'll be moving a drill -- one drill, at least, down to the southern portion of the exploration concessions,** which covers Charlize and C69.  So, we expect the drilling to commence this month, **and your results will start to flow back towards the end of Q2,** with preliminary results.

George Topping - Stifel Nicolaus – Analyst:

Okay.  And how much drilling do you expect to come back with?

Defendant Masteman:

**We have a plan of around about 15,000 meters initially, on -- between those southern targets.  And depending on the results, as they start to come back, we'll either continue the drilling or move on to some of the other targets.**

*       *       *

Greg Barnes - TD Newcrest/Waterhouse Securities – Analyst:

Question for Glen.  **It sounds like the drilling at Tasiast is getting close to being done on the West Branch.** You have 26 drills there.  What do you plan to do with those drills?  Do you send them back, or do you start drilling aggressively further along the trend?

Defendant Masterman:

Greg, **we are re-deploying the drills, as we speak, along the trend, and there are number of targets adjacent to the West Branch area we've been drilling the last six months.** But we are currently active on them.  And the first targets we have a number of core drills testing under the [Piment] pits along strike to the north.  In addition to that, we'll also redeploy the RC drills onto some of the outlying targets along the trend.

So, as I mentioned earlier, a drill will be heading down -- heading towards Charlize C69, on the southern end of the concessions this month.  We also have an RC drill currently looking to extend the resource of prolongation.  So, at the north end of the mine trend.  And once that drilling is -- once the first phase of drilling there is completed, we'll put the drill onto the target at C67.  **So, the drills are gradually**

- 17 -

**evolving away from the big definition drilling program. We're constantly assessing our drilling [mates] as we go**, and we'll make decisions accordingly. And the influencing factors there are any ongoing feasibility requirements, and also how these additional targets progress in terms of results [SART flowing].

39.    That same day, on May 3, 2011, Kinross filed its interim financial statements for the three months ended March 31, 2011 with the SEDAR. Such financial statements represented that they were prepared in conformity with International Financial Reporting Standards ("IFRS") and International Accounting Standard ("IAS") No. 34, *Interim Financial Reporting*.

40.    Also on May 3, 2011, Defendants Burt and Barry filed the following certifications with SEDAR:

I, [Defendant Burt and Barry], certify the following:

1.    **Review**: I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Kinross Gold Corporation (the "issuer") for the interim period ended March 31, 2011.

2.    **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the interim filings.

3.    **Fair presentation**: Based on my knowledge, having exercised reasonable diligence, the interim financial statements together with the other financial information included in the interim filings fairly present in all material respects the financial condition, results of operations and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4.    **Responsibility**: The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5.    **Design**: Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the end of the period covered by the interim filings

(a)    designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

(i) material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

(ii) information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

(b)      designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1      **Control framework**:  The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is Internal Control - Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission.

5.2      **ICFR - material weakness relating to design**: N/A

5.3      **Limitation on scope of design**:  The issuer has disclosed in its interim MD&A

a)      the fact that the issuer's other certifying officer(s) and I have limited the scope of our design of DC&P and ICFR to exclude controls, policies and procedures of a business that the issuer acquired not more than 365 days before the last day of the period covered by the interim filings; and

b)      summary financial information about the proportionately consolidated entity, variable interest entity or business that the issuer acquired that has been proportionately consolidated or consolidated in the issuer's financial statements.

6.      **Reporting changes in ICFR**:  The issuer has disclosed in its annual MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2011 and ended on March 31, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

Date: May 3, 2011 [Emphasis in original.]

41.      The above certifications were repeated in all material respects and filed with SEDAR

after the completion of Kinross's 2011 second and third fiscal quarters.

42.     On July 14, 2011, Kinross issued a press release announcing that Richard Clark, former President and CEO of Red Back had resigned from the Kinross Board of Directors to focus his time on other ventures in the mining industry.

43.     On August 10, 2011, Kinross issued a press release announcing its financial results for its 2011 second quarter, the period ended June 30, 2011. The Company reported revenue for the quarter of $987.8 million and net earnings attributable to common shareholders of $247.4 million. The press release also announced that Kinross's production in the second quarter of 2011 was 696,631 gold equivalent ounces and that it remained on track to meet its full-year production forecast of 2.6 - 2.7 million attributable gold equivalent ounces. In addition, the press release highlighted the positive findings associated with Tasiast's drilling programs and that, the Company announced significant new opportunities beyond those incorporated in Tasiast's initial scoping study, and had increased its gold inventory. In particular, the press release stated, in part, that: (1) **drilling at Tasiast resulted in the upgrade of 6.4 million gold ounces** of inferred resource to measured and indicated mineral resource categories, and added approximately **2.9 million gold ounces to the total mineral resource inventory**; (2) **recent drill results** in the West Branch and Piment zones indicated **significant new opportunities beyond those incorporated in the initial project scoping study**, including potential for supplemental heap leach production and a potential new zone of mineralization; and (3) **Kinross had extended its Tasiast feasibility study to analyze and incorporate new drill data into the project scope** and that the feasibility study extension was not expected to impact the project's development schedule. In addition, the press release noted Kinross's aggressive Tasiant's drilling program had yielded a large amount of "very encouraging" new data that added to its geological confidence and overall size of the project's mineral resource estimate and that, as a result of such positive developments, Kinross was delaying the project's

feasibility study, but not its development schedule, so that the favorable new positive drilling data could be analyzed and incorporated within in project's development framework, stating, in pertinent part, as follows:

> **The Company continued its aggressive drilling program at Tasiast in the first half of 2011, gathering a large amount of new drill data beyond that incorporated in the initial project scoping study. Results from the drilling program continue to be very encouraging, increasing geological confidence in the mineral resource estimate, adding to the size of the overall mineral resource estimate, and indicating the potential for additional areas of mineralization beyond those incorporated in the initial project mine plan.**
>
> Based on recent drill results and other emerging opportunities, outlined below, **Kinross believes there is significant potential to optimize the project and enhance overall economics in a number of key areas. In order to allow proper analysis of these emerging opportunities, and to potentially incorporate them into an optimized project configuration, work on the feasibility study will be extended until the end of the first quarter of 2012. However, this extension is not expected to impact the project's overall development schedule,** with construction expected to commence mid-2012 and production start-up targeted for early 2014.
>
> \*      \*      \*
>
> Key project highlights are as follows:
>
> **Mineral resource update:** Infill exploration drilling of greenschist mineralisation at West Branch **has significantly increased both the geological confidence and overall size of the mineral resource estimate. Compared to year-end 2010, approximately 6.4 million gold ounces have been upgraded from inferred to measured and indicated categories of mineral resource. Measured and indicated mineral resources now total approximately 9.1 million ounces, a more than fourfold increase since year-end 2010.** In addition, **approximately 2.9 million gold ounces have been added to the total mineral resource estimates** (comprising proven and probable mineral reserves, measured and indicated mineral resources, and inferred mineral resources), an increase of 16% in total mineral resources and reserves since year-end 2010. **The extension of the feasibility study will allow incorporation of additional drill results into the project model and economics.** A comparison of changes in the Tasiast mineral reserve and mineral resource estimate from December 31, 2010 to June 30, 2011, is summarized below:

| Category | December 2010 | | | June 2011 | | |
|---|---|---|---|---|---|---|
| | Tonnes (kt) | Grade (g/t) | Ounces (koz) | Tonnes (kt) | Grade (g/t) | Ounces (koz) |
| Proven and Probable Mineral Reserve | 128,916 | 1.82 | **7,563** | 128,916 | 1.82 | **7,563** |
| Measured and Indicated Mineral Resource | 96,334 | 0.67 | **2,088** | 237,300 | 1.19 | **9,050** |
| Inferred Mineral Resource | 182,805 | 1.47 | **8,615** | 218,903 | 0.65 | **4,590** |

*Please refer to the Mineral Reserve and Mineral Resource table and corresponding notes located in Appendix 1 at the end of this news release.*

**Potential Piment orebody extensions and mine plan expansion: Encouraging results from drill holes beneath the Piment zone indicate the potential for additional mineralization** that, if fully delineated, may result in a larger orebody than previously considered. This could provide justification to expand the existing mine plan and pit model. These results warrant further analysis and consideration in the project feasibility study.

**Potential heap leach opportunity at West Branch**: In addition to the higher grade greenschist mill ore contained in the West Branch mine plan of the project scoping study, **recent drilling has confirmed the presence of lower grade sulphide mineralisation enveloping the main** West Branch orebody in the existing pit model which may be amenable to crushing and heap leaching. If so, this would potentially improve the strip ratio and project economics by converting material previously considered waste rock into ore. The potential for a supplemental heap leach facility is now being studied as part of the project feasibility study.

**Potential deep extension of West Branch orebody**: Encouraging results from holes beneath the existing West Branch pit model **confirm the potential for an extension to the higher grade greenschist mineral resource**.

**Drilling encounters further mineralization at targets north and south of the mine**: Completion of the next phase of drilling in the Tasiast Sud area 10 kilometres south of the mine **yielded further encouraging results at the C69 and Charlize targets**. Additional work is required to fully understand the significance of the new data and the Company is planning more drilling to evaluate mineral resource potential at both targets. Drilling continued at C67 (5 kilometres north of Tasiast) during the quarter; however, assay results were not available at the time of preparation of this news release.

Defendant Burt commented on the Company's results, stating, in pertinent part, as follows:

Solid performance from our operations – notably Kupol, Maricunga, and Fort Knox – helped Kinross to deliver record production, revenue, and margins in the second quarter amid continuing strong gold prices. Despite industry-wide cost pressures, our second quarter cost of sales remained at the low end of our guidance range.

**We continue to believe that Tasiast is one of the world's great gold projects and a long-term foundation asset for Kinross. Our drilling campaign at Tasiast is yielding exciting results which not only increase our confidence in the resource, but suggest significant new opportunities and potential project expansions which warrant further study.** We continue to make good progress advancing our other growth projects at Dvoinoye, Fruta del Norte, and Lobo-Marte, though like the rest of the industry, we are experiencing pressure on capital costs. Meanwhile, our strategic focus on building a high-quality exploration pipeline is delivering highly encouraging results at a number of targets across the company.

We have decided to increase our dividend by 20%, reflecting our confidence in the long-term prospects for the gold price and in our industry-leading growth profile.

44.     Following the Company's 2011 fiscal second quarter earnings announcement, Kinross held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants reiterated their positive statements about the Company's prospects and Tasiast.  Defendants also highlighted the positive results of Tasiast's aggressive exploration drilling program, stating, in pertinent part, as follows:

Defendant Burt:

As you saw in yesterday's press release, **we have exciting news at Tasiast. We've encountered new gold intercepts** outside the core of West Branch zone. **This and other discoveries create new opportunities. And reinforce the view that Tasiast is becoming 1 of the largest, most prolific gold districts in the world. In short, we believe there is significant potential to optimize the Tasiast project and enhance overall project economics in a number of areas. This means we're extending the completion of the feasibility study to the first quarter of 2012. But importantly -- and I want to emphasize this -- construction of the new mill will commence as planned in the first half of 2012.**

**We're continuing to see very exciting results from the ongoing drill campaign at Tasiast. Recent drill results** from 3 different areas within the West Branch and commence zone **indicates significant new opportunities beyond those in the scoping study**.

We've had encouraging results from drill holes beneath the Piment pit that suggests there's a potential new zone of mineralization that, if fully delineated, may result in an expansion to the proposed pit.  In addition, recent drilling at West Branch itself has confirmed the presence of a lower grade sulfide mineralization envelope around the main West Branch ore body, providing the potential for an additional heap leach facility.  We've also upgraded approximately 6.4 million ounces of inferred resource to measured and indicated, which has increased more than 4-fold.  And **added**

- 23 -

approximately 2.9 million gold ounces to the total mineral resource estimate, which is a 16% increase since the December year-end estimate.

Overall, **the results of the drill program and the large amount of new data that we've gathered beyond the scoping study completed 6 months ago, have continued to be very encouraging, increasing geologic confidence in the mineral resource estimate, adding to the size of the overall resource.** And indicating the potential for additional areas of mineralization beyond those incorporated in the initial project mine plan. As I've mentioned, **we are extending the completion of the feasibility study to the first quarter of '12 in order to fully analyze and incorporate that new data into the project scope and allow proper analysis of these emerging opportunities.** As well as to potentially incorporate them into an optimized project configuration. We do not expect that extension to impact the project's overall development schedule. Construction is still planned to commence in the first half of 2012 and production startup is targeted for early 2014.

*       *       *

We continue to advance our drill program at Tasiast, discovering new potential at the project literally every day, even as we make progress on the project feasibility study. We're also making good progress advancing both our at-site and new development growth projects.

<u>Defendant Masterman:</u>

**Exploration at Tasiast is our most important initiative,** where our drilling has added to mineral resource estimates and also to our excitement about the potential that the district will continue to grow. We are continuing in our aggressive drill campaign, with 15 core and 8 reverse circulation rigs in operation. And a total of 250,000 meters completed year-to-date. **Infill exploration drilling** of green-schist style mineralization at West Branch **has significantly increased both the geologic confidence and overall size of the mineral resource estimate.** Compared to year-end 2010, **we've upgraded approximately 6 million ounces of inferred mineral resource to measured and indicated categories, an increase of over 300% to approximately 9.1 million ounces. We've also added approximately 2.9 million ounces to the total mineral resource inventory,** increasing aggregate mineral resources across all categories to a total of 21.2 million ounces, inclusive of reserves.

*       *       *

Owing to the success of our exploration programs at Tasiast and on our other projects world-wide, we are increasing the aggregate exploration expenditure by approximately $10 million to $20 million for the remainder of 2011, above our previously stated forecast of $175 million.

- 24 -

Defendant Thomas:

As Tye mentioned, **we have extended the time line for the Tasiast feasibility study in order to analyze a number of new opportunities to optimize and enhance the project's economics.** Accordingly, we have extended work on the feasibility study until the end of the first quarter 2012.  We do not expect this extension to impact the project's overall development schedule.  Construction is expected to commence in mid 2012 and production startup is still targeted for early 2014.

Extending the feasibility study will allow us to incorporate additional data from the ongoing drilling program into the project model and economics.  And to evaluate and analyze a number of emerging opportunities which include encouraging results from drill holes beneath the Piment zone that suggest the a potential for a larger ore body. The potential for a supplemental heap leach facility, as recent drilling has confirmed the presence of lower-grade sulfide mineralization enveloping the main West Branch ore body.  New opportunities to optimize project economics through infrastructure and power generation options such as LNG.

45.    That same day, August 10, 2011, Kinross filed its interim financial statements for the three months ended June 30, 2011 with the SEDAR.  Such financial statements represented that they were prepared in conformity with International Financial Reporting Standards ("IFRS") and International Accounting Standard ("IAS") No. 34, *Interim Financial Reporting*.

46.    The above statements by Defendants, and others like them throughout the Class Period, left investors with only one conclusion: the outlook for Kinross's operations - - particularity with respect to the high growth Tasiast property - - was very positive.

47.    Then on the heels of Defendants' positive statements about the exploratory findings at its Tasiast property, on August 15, 2011, Kinross issued a press release announcing a $1 billion offering of unsecured, senior debt securities.

48.    On November 2, 2011, Kinross issued a press release announcing its financial results for its 2011 third quarter, the period ended September 30, 2011.  The Company reported revenue for the quarter of $1.069.2 million and net earnings attributable to common shareholders of $212.6 million.  The press release also announced that Kinross's production in the third quarter of 2011 was

647,983 gold equivalent ounces and that it remained on track to meet its full-year production forecast of 2.6 - 2.7 million attributable gold equivalent ounces.  In addition, the press release noted that Kinross completed its $1 billion offering of debt securities on August 22, 2011.  With respect to Tasiast, the press release noted that key development activities at the property were proceeding on schedule and that drilling continued to witness the encouraging results.  Defendant Burt commented on the Company's results, stating, in pertinent part:

> Kinross recorded another strong quarter, with revenue exceeding $1 billion for the first time, and adjusted operating cash flow increasing by more than 82% year-over-year to a record $422 million.  Adjusted net earnings were more than double those of the same period last year, while adjusted net earnings per share increased by 60%.  Cost of sales per ounce was higher than the previous quarter, due to industry-wide cost pressures, as well as the impact of mining lower grade portions of the orebody at several operations.  Overall, we remain on track to meet our 2011 production and cost of sales guidance.
>
> **We made significant progress in the quarter advancing our industry-leading growth program.  Our drilling campaign at Tasiast continues both to confirm our confidence in the resource and indicate potential further expansions to our previous model.  We received approval of the first phase environmental impact assessment at Tasiast, and mobilization for construction is underway.**  We continued to advance our other growth projects, all of which remain on schedule.  Meanwhile, our global exploration effort continues to bear fruit, with the discovery of an important new area of mineralization close to surface at La Coipa in Chile.
>
> **Our successful completion of a $1 billion debt offering during the quarter confirmed the market's confidence in Kinross' ability to deliver on our strategy, and strengthened our foundation for growth.**

49.     Following the Company's 2011 fiscal third quarter earnings announcement, on November 2, 2011, Kinross held a conference call with analysts and investors to discuss the Company's earnings and operations.  On the conference call, Defendants reiterated their positive statements about the Company's prospects and Tasiast.  For example:

Defendant Burt:

At Tasiast and Mauritania we received approval of the environmental impact assessment for early works.  Construction contractors and equipment are now being mobilized.  Additional EIAs for the project expansion are on schedule.  Engineering

- 26 -

work and project procurement is also continuing on schedule. The feasibility study is expected to be complete at the end of the first quarter of 2012, and the project startup is targeted for mid-2014

*　　　*　　　*

**The ongoing drilling campaign at Tasiast continues to confirm our confidence in the mineral resource there**. We have set out several examples on slide eight. **The infill program was extended in Q3 and focused on the West Branch and Piment areas. This work is now 95% complete**. We'll be redeploying drills in Q4 to accelerate exploration along the mine corridor and on district targets.

*　　　*　　　*

We continue to advance our drill program at Tasiast, which continues to confirm our confidence in the mineral resource there. We're also making good headway both our at-site and new development growth projects.

Defendant Thomas:

**Key project development activities at Tasiast are proceeding on schedule. Work on the feasibility study remains on schedule for expected completion at the end of the first quarter of 2012.** Production startup is targeted for mid-2014. As Tye mentioned, with the approval of the early works EIA, mobilization of the construction contractor is underway. This allows for early earth works and concrete foundations for the mill and on-going -- on-site power plant, interim expansion of the existing water supply system to meet construction and current operational requirements, construction and operation of the initial phase of the new tailings facility, and an expansion of camp facilities by 6,600 additional beds.

50.　　That same day, on November 2, 2011, Kinross filed its interim financial statements for the three months ended September 30, 2011 with the SEDAR. Such financial statements represented that they were prepared in conformity with International Financial Reporting Standards ("IFRS") and International Accounting Standard ("IAS") No. 34, *Interim Financial Reporting*.

51.　　The statements referenced above in ¶¶ 29-32, 34, 36-41, 43-45 and 48-50 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)　　that the drilling results at the Kinross Tasiast property had exhibited high amounts of low-grade ores;

- 27 -

(b)      that, as a result of the high levels of known, but undisclosed, low grade gold ore concentrations witnessed at the Tasiast property, the Company would need to modify its mining processes to help minimize operating costs and maximize profitability;

(c)      that, as a result of the foregoing circumstances, applicable accounting standards required the Company to record an impairment in the value of goodwill that Kinross attributed to the Tasiast property;

(d)      that the Company's financial statements were not fairly presented in conformity with IFRS and were materially false and misleading;

(e)      that the certifications issued by Defendants Burt and Barry during the Class Period associated with the Company's financial statements and internal and disclosure controls were materially false and misleading; and

(f)      that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business prospects and the Tasiast property during the Class Period.

52.      On January 16, 2012, Kinross issued a press release announcing its preliminary 2011 results and 2012 outlook.  The press release noted that the Company's three major growth projects at Tasiast, Fruta del Norte, and Lobo-Marte would require significant capital expenditures and that as a result of the Company's "increased understanding" of the Tasiast orebody, Kinross had elected to conduct a comprehensive capital and project optimization process to efficiently advance development of the project and generate enhanced returns on capital.  The press release also disclosed that "[i]n view of the Company's evolving understanding of Tasiast project parameters, and market conditions, including industry-wide increases in capital and operating costs, the

Company expects to record a material non-cash accounting charge, primarily relating to the goodwill recorded for the Tasiast mine," which totaled $4.6 billion at September 30, 2011.

53.     In response to the Company's announcement, the price of Kinross common stock plummeted nearly *19%*, from $12.65 per share on January 13, 2012 to $10.27 on January 17, 2012.

54.     The market for Kinross common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Kinross common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Kinross common stock relying upon the integrity of the market price of Kinross common stock and market information relating to Kinross, and have been damaged thereby.

55.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Kinross common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

56.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Kinross's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Kinross and its business, prospects and operations, thus causing the Company's common stock to be

overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

57.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Kinross, their control over, and/or receipt and/or modification of Kinross's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

58.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

59.    The Individual Defendants, because of their positions with Kinross, controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of Kinross's corporate statements and are therefore responsible and liable for the representations contained therein.

60.     The scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Burt and Barry, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Kinross was made known to them and that the Company's disclosure related controls were operating effectively.

61.     In addition, Defendants were motivated to engage in the acts alleged herein to facilitate the Company's $1 billion debt offering during the Class Period. Defendants permitted such offering to occur after having provided the marketplace with materially misleading information about the Tasiast's drilling results and the Company's financial performance and in order to maximize the amount of money that the Company could raise in such offering.

62.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow high-level Company officers to sell shares of their personally-held Kinross common stock at inflated prices that yielded them proceeds in excess of $19.7 million during the Class Period.

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Baker, Rick Allen | Senior Officer of Issuer | 22-Feb-2011 | 642 | $15.96 | $10,246 |
| Baker, Rick Allen | Senior Officer of Issuer | 23-Feb-2011 | 557 | $15.72 | $8,756 |
| Baker, Rick Allen | Senior Officer of Issuer | 24-Mar-2011 | 3,441 | $16.31 | $56,123 |
| Baker, Rick Allen | Senior Officer of Issuer | 31-Mar-2011 | 3,000 | $15.30 | $45,900 |
| Baker, Rick Allen | Senior Officer of Issuer | 31-Mar-2011 | 3,000 | $15.66 | $46,980 |
| Baker, Rick Allen | Senior Officer of Issuer | 06-Jun-2011 | 3,000 | $15.11 | $45,330 |
| Baker, Rick Allen | Senior Officer of Issuer | 02-Sep-2011 | 5,000 | $18.00 | $90,000 |
| Baker, Rick Allen | Senior Officer of Issuer | 06-Sep-2011 | 5,000 | $17.35 | $86,740 |
| | | | 23,640 | | $390,075 |
| | | | | | |
| Boehlert, Thom Michael | Senior Officer of Issuer | 23-Feb-2011 | 7,445 | $15.56 | $115,844 |

| | | | | | |
|---|---|---|---|---|---|
| Burt, Tye W | Senior Officer of Issuer | 22-Feb-2011 | 14,912 | $15.85 | $236,355 |
| Burt, Tye W | Senior Officer of Issuer | 23-Feb-2011 | 21,456 | $15.56 | $333,855 |
| Burt, Tye W | Senior Officer of Issuer | 31-Mar-2011 | 126,701 | $15.36 | $1,946,127 |
| | | | 163,069 | | $2,516,338 |
| | | | | | |
| Clark, Richard P | Director of Issuer | 17-Mar-2011 | 500,000 | $14.50 | $7,250,000 |
| Clark, Richard P | Director of Issuer | 18-Mar-2011 | 500,000 | $14.60 | $7,300,000 |
| | | | 1,000,000 | | $14,550,000 |
| | | | | | |
| Colnett, Lisa | Senior Officer of Issuer | 22-Feb-2011 | 3,812 | $15.85 | $60,420 |
| Colnett, Lisa | Senior Officer of Issuer | 23-Feb-2011 | 726 | $15.56 | $11,297 |
| Colnett, Lisa | Senior Officer of Issuer | 10-Nov-2011 | 2,505 | $14.19 | $35,546 |
| | | | 7,043 | | $107,263 |
| | | | | | |
| Crossland, James | Senior Officer of Issuer | 22-Feb-2011 | 3,978 | $15.85 | $63,051 |
| Crossland, James | Senior Officer of Issuer | 23-Feb-2011 | 3,328 | $15.56 | $51,784 |
| Crossland, James | Senior Officer of Issuer | 29-Aug-2011 | 1,087 | $17.20 | $18,696 |
| Crossland, James | Senior Officer of Issuer | 09-Sep-2011 | 13,334 | $18.05 | $240,679 |
| | | | 21,727 | | $374,210 |
| | | | | | |
| Flores Zelaya, Jose Eduardo | Director or Senior Officer of Insider | 09-May-2011 | 6,369 | $14.54 | $92,605 |
| | | | | | |
| Galassini, John Christopher | Director or Senior Officer of Insider | 22-Feb-2011 | 861 | $15.96 | $13,742 |
| Galassini, John Christopher | Director or Senior Officer of Insider | 09-May-2011 | 1,834 | $14.47 | $26,538 |
| | | | 2,695 | | $40,280 |
| | | | | | |
| Gold, Geoffrey Peters | Senior Officer of Issuer | 22-Feb-2011 | 3,978 | $15.85 | $63,051 |
| Gold, Geoffrey Peters | Senior Officer of Issuer | 23-Feb-2011 | 5,524 | $15.56 | $85,953 |
| Gold, Geoffrey Peters | Senior Officer of Issuer | 16-May-2011 | 7,334 | $14.00 | $102,676 |
| Gold, Geoffrey Peters | Senior Officer of Issuer | 06-Sep-2011 | 10,000 | $17.82 | $178,200 |
| | | | 26,836 | | $429,881 |
| | | | | | |
| Henderson, Robert Duncan | Senior Officer of Issuer | 22-Feb-2011 | 1,242 | $15.85 | $19,686 |
| Henderson, Robert Duncan | Senior Officer of Issuer | 23-Feb-2011 | 1,269 | $15.56 | $19,746 |
| Henderson, Robert Duncan | Senior Officer of Issuer | 08-Nov-2011 | 2,141 | $15.07 | $32,265 |
| | | | 4,652 | | $71,696 |
| | | | | | |
| Hinze, Brant Elmer | Senior Officer of Issuer | 08-Nov-2011 | 4,319 | $15.07 | $65,087 |
| | | | | | |
| Huxley John M H | Director of Issuer | 01-Sep-2011 | 266 | $16.80 | $4,469 |
| | | | | | |
| Isto, Mark Edward | Senior Officer of Issuer | 22-Feb-2011 | 1,404 | $15.85 | $22,253 |
| Isto, Mark Edward | Senior Officer of Issuer | 23-Feb-2011 | 1,278 | $15.56 | $19,886 |
| Isto, Mark Edward | Senior Officer of Issuer | 08-Nov-2011 | 384 | $15.07 | $5,787 |
| | | | 3,066 | | $47,926 |

| | | | | | |
|---|---|---|---|---|---|
| Lam, Juliana Lan | Senior Officer of Issuer | 22-Feb-2011 | 963 | $15.85 | $15,264 |
| Lam, Juliana Lan | Senior Officer of Issuer | 23-Feb-2011 | 1,011 | $15.56 | $15,731 |
| Lam, Juliana Lan | Senior Officer of Issuer | 15-Aug-2011 | 1,781 | $15.53 | $27,659 |
| Lam, Juliana Lan | Senior Officer of Issuer | 08-Nov-2011 | 638 | $15.07 | $9,615 |
| | | | 4,393 | | $68,268 |
| | | | | | |
| Masterman, Glen | Senior Officer of Issuer | 14-Sep-2011 | 15,000 | $16.83 | $252,450 |
| Masterman, Glen | Senior Officer of Issuer | 08-Nov-2011 | 2,908 | $15.07 | $43,824 |
| | | | 17,908 | | $296,274 |
| | | | | | |
| Naidoo, Erwyn Mark | Senior Officer of Issuer | 22-Feb-2011 | 1,196 | $15.85 | $18,957 |
| Naidoo, Erwyn Mark | Senior Officer of Issuer | 23-Feb-2011 | 555 | $15.56 | $8,636 |
| Naidoo, Erwyn Mark | Senior Officer of Issuer | 28-Mar-2011 | 816 | $15.54 | $12,681 |
| Naidoo, Erwyn Mark | Senior Officer of Issuer | 17-Aug-2011 | 450 | $16.50 | $7,425 |
| Naidoo, Erwyn Mark | Senior Officer of Issuer | 08-Nov-2011 | 1,024 | $15.07 | $15,432 |
| | | | 4,041 | | $63,130 |
| | | | | | |
| Radford, Lawrence Philip | Director or Senior Officer of Insider | 22-Feb-2011 | 835 | $16.13 | $13,469 |
| Radford, Lawrence Philip | Director or Senior Officer of Insider | 23-Feb-2011 | 732 | $15.89 | $11,631 |
| Radford, Lawrence Philip | Director or Senior Officer of Insider | 06-Sep-2011 | 2,300 | $17.68 | $40,664 |
| | | | 3,867 | | $65,764 |
| | | | | | |
| Rollinson, Jonathon Paul | Senior Officer of Issuer | 17-Feb-2011 | 2,100 | $18.32 | $38,472 |
| Rollinson, Jonathon Paul | Senior Officer of Issuer | 22-Feb-2011 | 5,634 | $15.85 | $89,299 |
| Rollinson, Jonathon Paul | Senior Officer of Issuer | 23-Feb-2011 | 2,225 | $15.56 | $34,621 |
| Rollinson, Jonathon Paul | Senior Officer of Issuer | 26-Sep-2011 | 13,970 | $15.59 | $217,792 |
| | | | 23,929 | | $380,184 |
| | | | | | |
| Thomas, Kenneth A | Senior Officer of Issuer | 22-Feb-2011 | 896 | $15.85 | $14,202 |
| Thomas, Kenneth A | Senior Officer of Issuer | 12-Dec-2011 | 3,106 | $13.13 | $40,782 |
| | | | 4,002 | | $54,983 |
| | | | | | |
| | | Total: | 1,329,267 | | $19,734,277 |

### Loss Causation/Economic Loss

63.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the price of Kinross common

stock and operated as a fraud or deceit on Class Period purchasers of Kinross common stock by

failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Kinross common stock fell precipitously as the prior artificial inflation came out.

64.     As a result of their purchases of Kinross common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Kinross common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $18.25 per share on September 8, 2011.

65.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Kinross's business and prospects.  When the truth about the Company was revealed to the market, the price of Kinross common stock fell precipitously.  These declines removed the inflation from the price of Kinross common stock, causing real economic loss to investors who had purchased Kinross common stock during the Class Period.

66.     The declines in the price of Kinross common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Kinross common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Kinross common stock and the subsequent significant decline in the value of Kinross common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## Applicability of Presumption of Reliance:
## Fraud on the Market Doctrine

67.     At all relevant times, the market for Kinross common stock was an efficient market for the following reasons, among others:

(a)     Kinross common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Kinross filed periodic public reports with the SEC and the NYSE;

(c)     Kinross regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Kinross was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for Kinross common stock promptly digested current information regarding Kinross from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Kinross common stock during the Class Period suffered similar injury through their purchase of Kinross common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

69.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Kinross who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

73.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kinross common stock.  Plaintiff and the Class would not have purchased Kinross common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Kinross common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of Kinross within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Kinross, and their ownership of Kinross common stock, the Individual Defendants had the power and authority to cause Kinross to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 16, 2012                ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
                                                 SAMUEL H. RUDMAN

SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the complaint and authorized its filing.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| KGC | 10/11/2011 | 76 | 913.02 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| KGC | N/A | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of Feb. , 2011 2012 in _Irving_ , _Tx_ .
                                        City              State

(Signature) X _Bo Young Cha_

(Print Name) _Bo Young Cha_

2