UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                              :

CITY OF AUSTIN POLICE RETIREMENT SYSTEM,  :
*Individually and on Behalf of All Others Similarly*  :
*Situated*,                              :      12 Civ. 1203 (PAE)
                              :
                 Plaintiff,     :      <u>OPINION & ORDER</u>
        -v-                    :
                              :

KINROSS GOLD CORPORATION, TYE W. BURT,  :
PAUL H. BARRY, GLEN MASTERMAN, and  :
KENNETH G. THOMAS,               :

                Defendants.    :
                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       In this putative class action, lead plaintiff City of Austin Police Retirement System

("Austin") claims that defendants Kinross Gold Corporation ("Kinross" or the "Company") and

four individual Kinross officers violated §§ 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the United States Securities and

Exchange Commission's corresponding rule, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").  Austin

alleges that Kinross and its officers made materially false and misleading statements to investors

to the effect that (1) Kinross had done extensive due diligence before acquiring, in 2010, Red

Back Mining, Inc. ("Red Back"), a company mining gold in Africa; and (2) the rapid schedule

that Kinross set, after that acquisition, for developing the Tasiast gold mine in Mauritania, which

had been a principal asset of Red Back, was achievable.

       Presently pending are (1) defendants' motion to dismiss Austin's Amended Complaint

for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6); and (2) Austin's

motion to strike certain exhibits which  defendants submitted in support of that motion.  For the

reasons that follow, the Court grants Austin's motion to strike, and grants in part and denies in part defendants' motion to dismiss.

## I.   Background[1]

### A.  Facts

#### 1.  Parties

Kinross is a public company whose shares trade on the New York Stock Exchange ("NYSE").  It is engaged in, among other activities, mining, exploring, and acquiring gold-bearing properties.  Its gold production and exploration activities are primarily in Canada, the United States, the Russian Federation, Brazil, Ecuador, Chile, Ghana, and Mauritania.  Am. Compl. ¶ 37.

Red Back is a mining company.  In May 2010, Kinross purchased a 9.4% stake in Red Back for $583 million.  *Id.* ¶ 39.  In August 2010, Kinross announced its intention to acquire Red Back.  In September 2010, Kinross's shareholders approved that acquisition.

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all facts pled in the plaintiff's Amended Complaint ("Am. Compl.") (Dkt. 41) to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents incorporated into the complaint by reference and documents publicly filed with the SEC.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  For the limited purpose of resolving the motion to strike, the Court considers the exhibits in dispute, and the declarations and exhibits submitted in connection with that dispute.

The following abbreviations are used herein for the parties' memoranda of law:  (1) Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint Pursuant to Rules 9(b) and 12(b)(6) ("Kinross Br.") (Dkt. 39); (2) Lead Plaintiff's Opposition to Defendants' Motion to Dismiss ("Pl. Br.") (Dkt. 46); (3) Reply in Support of Defendants' Motion to Dismiss ("Kinross Reply Br.") (Dkt. 52); (4) Lead Plaintiff's Motion to Strike Certain Exhibits Submitted by Defendants in Connection With Their Motion to Dismiss Plaintiffs' Amended Complaint ("Pl. Strike Br.") (Dkt. 48); (5) Defendants' Opposition to Lead Plaintiff's Motion to Strike ("Kinross Strike Br.") (Dkt. 49); and (6) Reply in Support of Lead Plaintiff's Motion to Strike ("Pl. Strike Reply Br.") (Dkt. 50).

Austin is a single-employer, defined benefit, public employee retirement system.  It alleges that it purchased common stock of Kinross between August 3, 2010, and January 17, 2012 inclusive (the "Class Period"); that Kinross's stock price had been artificially inflated during that period as a result of material, uncorrected misstatements; and that Austin was damaged as a result.  Austin brings this suit individually and on behalf of all other persons and entities which purchased Kinross common stock on the NYSE during the Class Period and retained such shares until after the Class Period ended.[2]

The four officers whom Austin has sued ("the Individual Defendants") are Tye W. Burt, who, beginning in March 2005, was Kinross's president and chief executive officer, *id.* ¶ 26; Paul H. Barry, who, beginning March 31, 2011, became Kinross's president and chief financial officer, *id.* ¶ 27; Glen Masterman, who was Kinross's senior vice president of exploration, *id.* ¶ 28; and Kenneth G. Thomas, who was Kinross's senior vice president of projects, *id.* ¶ 29.  For purposes of this Opinion and Order, the Court refers to the defendants collectively as "Kinross."

## 2.  Timeline of Kinross's Acquisition of Red Back and Tasiast

On May 4, 2010, Kinross issued a news release announcing that its board had agreed to purchase a 9.4% stake in Red Back, for $583 million.  *Id.* ¶ 39.  In the news release, Kinross CEO Burt described the Red Back investment as "giv[ing] us a strategic stake in a fast-growing producer with great exploration potential . . . and assets in one of the world's most prolific gold regions."  *Id.*  One of Red Back's two primary projects was the Tasiast mine in Mauritania; the other was the Chirano mine in Ghana.  *Id.*  The following day, on an earnings call, Burt stated

---

[2] The initial complaint in this case was filed February 16, 2012, by a different putative lead plaintiff, Bo Young Cha.  Dkt. 1.  In an Opinion and Order issued May 31, 2012, the Court selected Austin as the lead plaintiff.  Dkt. 33.  In Order issued March 21, 2013, the Court re-captioned this case to reflect Austin as the lead plaintiff.  Dkt. 57.

that Kinross had "done our homework here . . . West Africa has been on our radar screen for a couple of years.  We've got months of technical due diligence and site visits."  *Id.* ¶ 40.

On August 2, 2010, Kinross issued a press release announcing that its board had unanimously agreed to acquire, for $7.1 billion, all outstanding shares of Red Back common stock that Kinross did not already own.  *Id.* ¶ 42.  Under the merger agreement, Red Back shareholders were to receive, for each Red Back common share, 1.778 Kinross common shares and 0.110 common share purchase warrants, requiring the issuance of 425 million common shares and 26 million common share purchase warrants.  *Id.* ¶ 43.

The following day, the start of the Class Period, Burt publicly stated that the dilution of Kinross's common shares was justified based on the "very large amount of work" Kinross had done, including on the Tasiast mine.  *Id.*  Kinross touted the Red Back acquisition as presenting a "transformational opportunity" for Kinross to become a "gold growth powerhouse," given, among other things, "the significant upside in reserves that we believe exists at Red Back, and Kinross's ability to accelerate that potential."  *Id.*  The same day, Burt told analysts that Kinross's goal was to "fast track" work at the Tasiast mine and that it planned to "embark on an accelerated exploration and development program" at Tasiast.  *Id.* ¶ 56.

On August 5, 2010, in a quarterly earnings conference call, Burt told Kinross investors that the Red Back acquisition had been "based on the extensive due diligence and technical work that we have completed over the last six months," including "intensive engineering, technical, geologic, metallurgic, and hydrological work."  *Id.* ¶ 45.  He added that "we have done far more homework than one would typically see in a significant acquisition."  *Id.*  Kinross held out the Tasiast mine as the "centerpiece of the Red Back acquisition."  *Id.* ¶ 46.  In a presentation on

August 16, 2010, Kinross stated that it possessed the requisite "experience and financial strength to optimize Red Back's assets and fast-track development plans . . . at Tasiast." *Id.* ¶ 56.

On August 9, 2010, Kinross announced that a shareholder meeting and vote on the Red Back acquisition would be held September 15, 2010. *Id.* ¶ 59.  Several weeks later, Kinross learned that a large proxy advisory firm, Institutional Shareholder Services ("ISS"), would issue a negative recommendation to Kinross shareholders regarding the merger. *Id.*  On September 1, 2010, Kinross issued a news release entitled "Kinross provides additional information on Red Back transaction." *Id.*  The news release, which Austin claims was intended to dissuade shareholders from heeding ISS and voting against the merger, updated investors about Kinross's development plans for Tasiast.  It set out what Austin terms "aggressive milestones for the anticipated completion [by Kinross] of the expansion program [at Tasiast] based on Kinross's purportedly extensive due diligence." *Id.* ¶ 60.  Specifically, Kinross projected that it would complete a scoping study for the mine by December 2010, a feasibility study by July 2011, and the expansion project in its entirety within 36 months, in the fourth quarter of 2013. *Id.*

Notwithstanding Kinross's September 1, 2010 update, the following day, ISS issued a negative recommendation as to the merger.  ISS stated that although it was possible that "there is significantly more gold in the ground than is reflected in current reserves or analyst estimates," the transaction was too costly for Kinross shareholders to "tak[e] on the risk of that bet." *Id.* ¶ 62.  In a news release issued on September 3, 2010, Kinross rejected ISS's analysis, stating that ISS lacked relevant technical understanding and knowledge.  Kinross reiterated its view that the Tasiast mine had immense potential.  It cited "six months of exhaustive due diligence by its geologists, technical teams, and management, supported by independent opinions of respected outside consultants." *Id.* ¶ 63.

On September 7, 2010, Red Back announced a 42% increase in its estimate of Tasiast's gold resources. *Id.* ¶ 64. Burt, speaking for Kinross, stated that Red Back's new estimate "confirms Kinross's view of Tasiast's tremendous potential based on our six months of intensive due diligence." *Id.* ISS's proxy analyst, in response, stated that ISS adhered to its recommendation that shareholders oppose the merger. The ISS analyst stated that Kinross had not given "detailed support" to enable shareholders to understand its claims as to "how great the potential is" of the Tasiast mine. *Id.* ¶ 65.

On September 15, 2010, Kinross held a special shareholder meeting. *Id.* ¶ 66. Despite ISS's negative recommendation, 66.4% of Kinross shareholders approved the acquisition. *Id.* On September 17, 2010, the transaction was completed. *Id.*

### 3. Timeline of Post-Acquisition Events Relating to the Tasiast Mine

In or around October 2010, core drilling began at Tasiast, and, by November 2010, approximately 28 rigs were drilling at the mine and sending back samples. *Id.* ¶¶ 48, 88. In December 2010, Kinross completed its scoping study of the mine, in keeping with the schedule it had set. *Id.* ¶ 83.

On February 16, 2011, Kinross issued a press release setting out a schedule for development of the Tasiast mine. *Id.* ¶ 109. Kinross projected that the feasibility study would be complete by mid-2011, that construction would commence in mid-2012, and that mining operations would begin in early 2014. *Id.* ¶ 77. Each of those deadlines was consistent with the timetable announced in August 2010, save that the earlier timetable had projected that the expansion project would be complete by the fourth quarter of 2013. *Id.* ¶ 60.

On August 10, 2011, Kinross announced its first major delay to the Tasiast schedule. *Id.* ¶ 79. Kinross now anticipated that the feasibility study, earlier projected to be complete by mid-

2011, would be completed by the end of the first quarter of 2012. *Id.* ¶ 79. However, Kinross assured investors that neither the mine's construction nor its operational stages would be delayed. *Id.* ¶ 80. On November 2, 2011, in both a press release and a call with analysts, Kinross reiterated that the schedule for the mine's construction and operation remained intact. *Id.* ¶¶ 127, 129.

Five months later, on Monday, January 16, 2012, the day before the end of the Class Period, Kinross issued a press release reporting preliminary 2011 results and its forecast for 2012. *Id.* ¶ 91. The press release disclosed, for the first time, that Kinross would need an additional six to nine months to complete the Tasiast development project. *Id.* More broadly, Kinross stated that it would reassess the overall mining plan for Tasiast, and that it intended to "explore project development alternatives to those included in the original Tasiast scoping study, with the objective of improving project economics and reducing overall project execution risk." *Id.* ¶ 92. Kinross further announced that it would take a material non-cash charge to goodwill in the amount of approximately $2.9 million. *Id.*

Following this announcement, Kinross's stock price dropped approximately 19 percent, from $12.65 per share the previous trading day (Friday, January 13, 2012), to $10.27 when the market reopened on January 17, 2012. *Id.* ¶ 93.

### B. Procedural History

#### 1. The Amended Complaint

Less than a month later, on February 16, 2012, the initial Complaint in this case was filed, by then-putative lead plaintiff Bo Young Cha. Dkt. 1. On May 31, 2012, in an Opinion and Order issued following briefing as to the most suitable lead plaintiff, the Court appointed Austin to serve in that role. Dkt. 33.

On July 23, 2012, Austin filed its Amended Complaint, alleging violations of sections 10(b) and 20(a) of the Exchange Act and of Rule 10b-5.  Dkt. 41.  The Amended Complaint claims that Kinross made materially false and misleading statements to investors that artificially inflated the price of Kinross stock during the Class Period.  These alleged misstatements concern (1) the quality and extent of Kinross's due diligence with respect to the Tasiast mine; and (2) the schedule that Kinross set, following the completion of the acquisition of Red Back, for development of that mine.

### 2.  Kinross's Motion to Dismiss

On September 7, 2012, Kinross moved to dismiss the Amended Complaint.  Dkt. 38–40.  Kinross argues that Austin has failed adequately to plead (1) facts giving rise to a strong inference that defendants acted with scienter in their statements about due diligence and the mining schedule; and (2) that Kinross made actionable misstatements.  At very most, Kinross argues, the facts pled support only a finding that defendants were negligent in not knowing that their expectations as to the schedule for the future development of the Tasiast mine would not be met.  Kinross argues that materials cognizable on a motion to dismiss support a competing, non-fraudulent inference as to why the company failed to meet that schedule:  that unexpected industry-wide increases in capital and operating costs caused Kinross to delay the development of Tasiast.  Kinross Br. 2–3.  Kinross further argues that its statements as to both the quality of its due diligence and as to the Tasiast schedule were inactionable statements of puffery or opinion that it did not know were false when made and were not made recklessly.  Finally, Kinross argues, its statements as to the Tasiast schedule were not actionable because they were protected forward-looking statements.  *Id.* at 4.

On October 17, 2012, Austin opposed defendants' motion to dismiss.  Dkt. 46.  On November 16, 2012, defendants filed their reply.  Dkt. 52.

### 3.  Austin's Motion to Strike

On the same day it filed its opposition, Austin moved to strike 18 of the 34 exhibits that Kinross had submitted in support of its motion to dismiss.  Dkt. 47–48.  Those 18 exhibits ("the Disputed Exhibits") consist of analyst commentary about Kinross (Exhibits 13 and 16–18) or analyst or journalistic reports relating, or commenting upon, announcements by other gold-mining companies as to contemporaneous problems affecting their development projects (Exhibits 20–27 and 29–34).  Kinross had cited those exhibits in support of its argument that it had not acted with recklessness or fraudulent intent in failing to announce the delay of the development schedule for Tasiast until January 2012, but instead had merely fallen prey to unanticipated industry-wide cost increases that had dogged its competitors around the same time.  Austin argues that these exhibits may not be considered on a motion to dismiss because (1) Kinross, in using them as a basis for its argument that there is no fair inference of scienter, has improperly sought to use them for the truth of the matters asserted; and (2) they are not fairly referenced by the Amended Complaint.

On November 2, 2012, Kinross filed an opposition to Austin's motion to strike.  Dkt. 49.  On November 12, 2012, Austin filed its reply.  Dkt. 50.

On November 30, 2012, the Court held argument on both motions.

## II.    Austin's Motion to Strike

Because determining the universe of properly considered materials is a necessary predicate to considering Kinross's motion to dismiss, the Court turns first to Austin's motion to strike the 18 Disputed Exhibits.

### A.  Applicable Legal Standards

In evaluating a motion to dismiss in a securities action, the Court may take judicial notice of certain limited matters.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Evid. 201.  The Court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI*, 493 F.3d at 98 (citation omitted).  Outside of these categories, it is generally not appropriate for a court, on a motion to dismiss, to consider information or documents extrinsic to the complaint.

### B.  Discussion

Austin argues that it is improper to consider the Disputed Exhibits for the truth of the matter asserted therein, *i.e.*, that other companies within the mining industry experienced cost increases in or around 2011, which resulted in delays of their mining projects.  Pl. Strike Br. 3–5.  Austin also argues that the Disputed Exhibits are not "integral to, relied upon, attached to, or referenced in the Complaint," and, except for two exhibits (Exhibits 24 and 32) that are public filings with the SEC by Kinross's competitors, are not the types of public records that may be judicially noticed.  *Id.* at 2, 5–6.  Austin argues that to consider the Disputed Exhibits would convert the motion to dismiss into one for summary judgment, and necessitate opening discovery on the points at issue.

Kinross counters with two arguments.  First, it argues, the Court is permitted to "take judicial notice that industry-wide increase in costs caused numerous mining companies to delay large development projects"; it argues that this fact supports a competing, and benign, inference to Austin's scienter thesis that Kinross acted deliberately or recklessly in failing to announce

until January 2012 that the Tasiast development schedule would be delayed.  Kinross Strike Br.

4, 10 (citing *Tellabs*, 551 U.S. at 323–24).  Second, Kinross argues, the Disputed Exhibits may

be considered for the truth of the matters asserted therein.  *Id.* at 10–11.

### 1.   Judicial Notice of the Facts in the Disputed Exhibits

Under Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is

not subject to reasonable dispute because it: (1) is generally known within the trial court's

territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned."  *See Effie Film, LLC v. Pomerance*, No. 11 Civ.

7087 (JPO), 2012 WL 6584485, at *21–22 (S.D.N.Y. Dec. 18, 2012) (surveying the types of fact

of which courts have taken judicial notice).  Under Rule 201(b), courts have taken notice of

widely-known and typically market-wide events.  *See In re UBS AG Sec. Litig.*, No. 07 Civ.

11225 (RJS), 2012 WL 4471265, at *21 (S.D.N.Y. Sept. 28, 2012) (finding that "any alleged

failure to disclose was more likely attributable to the financial turmoil occurring in 2007 than to

fraud or recklessness"); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1341 n.1 (N.D.

Ga. 2010) (taking "judicial notice of the existence of the financial crisis," but "*not* that the crisis

*caused* the decline in HomeBanc's stock price" (emphasis added)); *In re 2007 Novastar Fin.,*

*Inc., Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008)

("reversals in [the mortgage] industry are amenable to judicial notice"), *aff'd*, 579 F.3d 878 (8th

Cir. 2009); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416,

421 (S.D.N.Y. 2003) (taking "judicial notice of the existence of the internet bubble and its

subsequent crash"); *Kramer v. Time Warner, Inc.*, No. 89 Civ. 8234 (LBS), 1990 WL 166665, at

*6 n.5 (S.D.N.Y. Oct. 24, 1990) (judicially noticing "widely-publicized collapse of the junk bond

market"), *aff'd*, 937 F.2d 767 (2d Cir. 1991).

The facts defendants ask the Court to judicially notice—that there were industry-wide increase in costs in the mining industry, and that these cost increases caused numerous mining companies to delay large development projects in or around 2011—are of a different character. The fact of cost increases affecting a particular industry, gold-mining, at a particular point in time, is not a well-publicized fact of which an average investor would be aware. *See In re Merrill Lynch*, 289 F. Supp. 2d at 421 n.6 (collecting other examples, including the stock market crashes of 1929 and 1987).   It is not a fact fairly termed "generally known" within this Court's jurisdiction.  Fed. R. Evid. 201(b).

In any event, even if it were appropriate to take judicial notice of the fact of rising gold-mining costs during 2011, the Court assuredly could not take notice of the fact (if indeed true) that such costs were what *caused* other companies in this sector to delay large mining projects. A case on which Kinross relies makes this very point.  *See 2007 Novastar Fin. Sec. Litig.*, 2008 WL 2354367, at *1 ("[J]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that fact to infer anything in particular about a business operating at the time.  In short, while the Court can take judicial notice of the fact that the Company's industry suffered reversals, the Court cannot take judicial notice of the impact of those industry-wide reversals on the Company.").  Not only is that causal link not a fact generally known within the Court's jurisdiction, but by their nature, the causes of a change in development plans may be multiple and/or disputed.  And the causal connection that defendants posit is plausibly subject to dispute.  It is, therefore, not appropriate for judicial notice under Rule 201(b).

### 2.   Consideration of the Disputed Exhibits for the Truth of the Matters Asserted

Alternatively, Kinross argues that the Disputed Exhibits may be considered by the Court as establishing the truth of the matters asserted therein, *i.e.*, that gold-mining costs increased in or around 2011, and that these cost increases caused various companies to delay gold-mining projects.  Kinross Strike Br. 10–11.  The law is to the contrary.  On a motion to dismiss a complaint alleging securities fraud, the Court may indeed consider documents filed with the SEC, but "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer*, 937 F.2d at 774).  Thus, where a court takes judicial notice of a public record that is integral to a fraud complaint, "it does so in order 'to determine *what* statements [they] contained'—but '*again not for the truth of the matters asserted*.'"  *Id.* (quoting *Kramer*, 937 F.2d at 774).  *Accord* 1–4 *Weinstein's Evidence Manual* § 4.02 (courts may "take judicial notice of facts that various newspapers, magazines, and books were published solely as an indication of information in the public realm at the time, not whether the contents of those articles were, in fact, true" (citations omitted)).  Similarly, courts often consider newspaper articles for the "fact of their publication" on a motion to dismiss, but not for the truth of the matters reported on.  *In re Merrill Lynch*, 289 F. Supp. 2d at 425 n.15; *see In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *32 n.28 (collecting cases).

*Kramer*, on which Kinross relies, does not assist its bid.  The Second Circuit has clarified that, in *Kramer*, the district court properly took judicial notice of the "publicized condition of the junk bond market during the relevant time period," but that fact "was not relied on for its truth."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Because the truth of these published reports was not a ground for the district court's decision, the district court's

consideration of them did "not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)." *Id.*

Here, it is unavoidable that Kinross is relying on the Disputed Exhibits for the truth of matters asserted in them. Confronted with Austin's scienter theory that Kinross adhered (recklessly or worse) to the stated Tasiast schedule long after it knew that that schedule was unrealistic, Kinross articulates the competing inference that the delay it announced in January 2012 was prompted by industry-wide cost increases that presumably became apparent to Kinross only shortly beforehand. In arguing for that inference, however, the fact that other companies (*e.g.*, Exs. 20, 23–27, 29–34) or analysts covering them (*e.g.*, Exs. 21–22) claimed that they had experienced cost overruns and/or that those overruns had resulted in delays of mining projects is of no assistance to Kinross except if taken for the truth. Similarly, the fact that Kinross and/or analysts following the company attributed project delays earlier in the Class Period (*e.g.*, Ex. 13) or in January 2012 (*e.g.*, Ex. 13, Exs. 16–18) to rising costs assists Kinross only if those statements are taken for their truth.

For these reasons, the Court grants Austin's motion to strike Exhibits 13, 16–18, 20–27, and 29–34.[3]

---

[3] This Court's ruling on the motion to strike does not preclude Kinross from *arguing*, in support of its motion to dismiss for failure adequately to plead scienter, that unanticipated cost increases are a more compelling explanation for its January 16, 2012 announcement of the Tasiast delay than Austin's thesis that the Tasiast development schedule was unrealistically and recklessly set and maintained. The Amended Complaint at several points quotes Kinross's statements, in and after the January 16, 2012 press release, attributing the delay in the Tasiast project to rising costs in the industry. *See, e.g.*, Am. Compl. ¶¶ 96, 131. Those statements, excerpted or referenced in the Amended Complaint, are properly considered on a motion to dismiss. To be sure, the Court may not treat Kinross's stated explanation as necessarily true—Austin's thesis in this case is that Kinross appreciated that the Tasiast schedule was unrealistic but nonetheless publicly clung to it. But it may consider, and has considered, Kinross's benign alternative explanation of industry-wide cost increases in determining whether the inference of scienter which Austin asserts is

**III.    Austin's Motion to Dismiss**

### A.  Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*").  However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*, 493 F.3d at 99; *see also Tellabs*, 551 U.S. at 322.  First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*").  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Specifically, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

---

"cogent and *at least as compelling*" as Kinross's.  *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324).

statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

A complaint alleging securities fraud must also comply with the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b). *See Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA."). In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary in order to make the statements not misleading, the plaintiff "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Thus, in order to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ.11278 (DLC), 2009 WL 4823923, at *7 (S.D.N.Y. Dec. 14, 2009).

In addition, a plaintiff pleading scienter in a securities fraud action "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent

and *at least as compelling* as any opposing inference one could draw from the facts alleged.'"
*ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original).

### B.  Austin's Two Theories of § 10(b) Liability

Austin sues under § 10(b) of the Exchange Act, which makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R, § 240.10b-5.  To state a claim for securities fraud under § 10(b) and Rule 10b–5, plaintiffs must, therefore adequately plead these six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."
*Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008).

Here, Austin alleges that Kinross made two sets of materially false statements or omissions during the class period.  Am. Compl. ¶ 2.  These concern (1) the extent and quality of the due diligence Kinross performed on the Tasiast mine before acquiring Red Back and setting the schedule for developing Tasiast, *id.* ¶¶ 102–108; and (2) Kinross's announced schedule for developing Tasiast, *id.* ¶¶ 109–111.

### 1. Kinross's Statements About Its Due Diligence

Austin recounts numerous statements by Kinross and the Individual Defendants regarding the extent of due diligence that Kinross performed before acquiring Red Back and setting the Tasiast schedule.

In August 2010, before the Red Back acquisition, Kinross described its diligence as "detailed" and "in-depth," and cited that diligence as the basis for its projections as to the Tasiast production schedule:  "Our view, based on the extensive due diligence and technical work that we have completed over the past six months, is that we can outperform those consensus numbers.  We plan to immediately embark on an accelerated exploration and development program, to consider scaling Tasiast to a higher production level."  *Id.* ¶ 102; *see also id.* ¶ 104 (citing to "intensive engineering, technical, geologic, metallurgical, and hydrological work."); ¶¶ 103, 105.

> Later, in September 2010, Kinross, in a news release, elaborated on its due diligence:
>
> Kinross' view of the significant potential of Red Back's Tasiast deposit—and its subsequent valuation for this transaction—is founded on six months of exhaustive due diligence by its geologists, technical teams, and management, supported by independent opinions of respected outside consultants. . . . Kinross' due diligence included multiple site visits, twinning of existing Red Back drill holes, extensive metallurgical testing, and modeling of options for mining and processing.  This work gave Kinross the confidence that Tasiast will be one of the world's leading gold deposits, presenting a unique and compelling growth opportunity for Kinross and Red Back shareholders.

*Id.* ¶ 107.

Austin alleges that these statements were materially false and misleading because "Kinross did not actually perform adequate due diligence on Tasiast because Defendants knew or should have known that the company overlooked significant variables that could offset performance and scheduling at the mine, including the hardness of the ore material present at the

18

deposit." *Id.* ¶ 108.  As evidence of the inadequacy of the diligence, Austin alleges that Kinross drilled at only one site at Tasiast and that it did not drill to a sufficient depth to constitute adequate due diligence.  Rather, Austin alleges, Kinross reached its judgment as to the character of the gold ore present by extrapolating from the results of lower-depth drilling, "which was highly speculative and prone to inaccuracies." *Id.*  Austin further argues that the later setbacks with regard to its development schedule confirm that the due diligence "was inadequate and did not provide Defendants a true understanding of the ore at Tasiast." *Id.*

## 2.  Kinross's Statements About the Tasiast Development Schedule

Austin also alleges that Kinross's public statements with respect to the schedule for development of the Tasiast expansion program were misleading.

In September 2010, before the Red Back acquisition, Kinross announced a schedule that contemplated completing the expansion program "within approximately 36 months, with a view to commencing operations at a new mill in the fourth quarter of 2013." *Id.* ¶ 106.  Kinross also stated that it "expect[ed] to fast-track engineering and project development work on the Tasiast expansion, including tendering for an EPCM contractor, completion of a scoping study by December 2010, and completion of a feasibility study by July 2011." *Id.*

In February 2011, after the acquisition, Kinross announced that the project feasibility study was scheduled for completion in "mid-2011," and that "construction [was] expected to start in mid-2012, with operations expected to commence early in 2014." *Id.* ¶ 109.  In a series of statements in March, April, and May 2011, Kinross stood by these dates. *See id.* ¶ 112 (March 2011:  "The feasibility study . . . remains on schedule for completion in mid-2011. . . . The expansion project remains on schedule to commence operation early in 2014."); *id.* ¶ 114 (April 2011:  "A feasibility study is expected to be completed in mid-2011, with start-up of the

expansion project targeted for the first half of 2014."); *id.* ¶¶ 116–118 (May 2011: "The feasibility study for the expansion is approximately 62% complete, and remains on schedule for completion in mid-2011. . . . The expansion project remains on schedule to commence operation in early 2014.").

Austin contends that these statements were materially false and misleading for several reasons.  First, it alleges that three former Kinross employees—whom it denotes as "FE-1," "FE-2," and "FE-3"—have stated that Kinross and the Individual Defendants "knew that schedule was 'basically impossible' and 'incredibly aggressive' due to the complexity of the project and the hardness of the ore.  *Id.* ¶ 111(a) (citing *id.* ¶¶ 48–55, 78, 84–90).  Second, it alleges, these Defendants knew that their original schedule was out of line with industry norms for such projects.  *Id.* ¶ 111(b) (citing *id.* ¶¶ 76–77).  Third, it alleges, the defendants knew or should have known of the facts (*e.g.*, the hardness of the rock in the Tasiast mine) that eventually led to increased costs and an extended timeline, because they had access to the company's ACQUIRE database, which provided this information in real time.  *Id.* ¶ 111(c) (citing *id.* ¶ 54).  Fourth, it alleges, Kinross's purported due diligence should have led it and the Individual Defendants to appreciate the problems that ultimately caused the development schedule to slip.  *Id.* ¶ 111(d). Fifth and finally, delays and increased costs that arose during the Class Period should have made defendants aware of the potential for delay.  *Id.* ¶ 111(e); *see also id.* ¶ 86 (alleging that "between November 2010 and early 2011, FE-1 would regularly submit reports concerning the engineering costs to Defendant Thomas").

As noted, on August 10, 2011, Kinross adjusted the schedule for Tasiast:  It announced that "work on the feasibility study will be extended until the end of the first quarter of 2012," *i.e.,* by about nine months.  *Id.* ¶ 121.  In a serious of statements, however, Kinross and its officials

stated that delaying the feasibility study would not affect the rest of the Tasiast schedule. The press release stated:

> The Company is extending its Tasiast feasibility study to analyze and incorporate this new drill data into the project scope, while exploring infrastructure development options to reduce project capital costs, which have been subject to industry-wide cost pressures. The feasibility study extension is not expected to impact the project's development schedule, which remains as previously disclosed, with construction expected to commence mid-2012 and production start-up targeted for early 2014.

*Id.* ¶ 120. In the same vein, during a conference call with analysts and investors the following day, August 11, 2011, Burt stated:

> In short, we believe there is significant potential to optimize the Tasiast project and enhance overall project economics in a number of areas. This means we're extending the completion of the feasibility study to the first quarter of 2012. But importantly -- and I want to emphasize this -- construction of the new mill will commence as planned in the first half of 2012.

*Id.* ¶ 122. On the same call, Thomas stated that the schedule for construction and production startup was still on track. *Id.* Both Burt and Thomas added that although the development schedule was an "aggressive timetable," the Tasiast project was "not complex" or "technically challenging," and both represented that the stated timetable could be met. *Id.* ¶¶ 123–124.

On November 2, 2011, in both a press release and a conference call, Kinross committed again to this revised schedule. In the press release, it stated that "[k]ey project development activities at Tasiast are proceeding on schedule. Work on the expansion project feasibility study continues and is expected to be completed at the end of the first quarter of 2012. Production startup is targeted for mid-2014." *Id.* ¶ 127. And on the conference call with analysts and investors to discuss the company's earnings and operations, Burt stated that "[t]here's no change intended in the timing. We have -- we're saying first half of 2014. We're on or ahead of schedule currently, so we have no reason to change that, and we're on track today." *Id.* ¶ 129.

Austin argues that these statements were materially false and misleading because they "gave investors the false impression that Defendants could still meet the aggressive schedule that they had established for the Tasiast expansion, which in fact Defendants knew was not possible." *Id.* ¶ 125.  Austin further argues that these statements failed to disclose the material negative information about the initial feasibility study.  *Id.*  Specifically, Austin quotes FE-2 as saying that the initial feasibility study had been shelved because Kinross had found a "negative rate of return" for the mine.  *Id.* ¶ 86.  It also quotes FE-1, who was informed by the firm performing the feasibility study that, because of the hardness of the ore, "it was going take double the amount of money [and more time] to build the plant to process it [the ore]."  *Id.* (alterations in original). Finally, Austin alleges that "by mid-2011, FE-1 was constantly upgrading the design for Tasiast because the project called for more and more electrical power."  *Id.*

As noted, on January 16, 2012, Kinross acknowledged that it would not meet the stated Tasiast development schedule.  In a press release it issued that day, Kinross stated:

> In view of the industry-wide escalation in project capital and operating costs, and given the Company's increased understanding of the Tasiast orebody and potential for alternative mining and processing rates and sequences, Kinross has elected to conduct a comprehensive capital and project optimization process with the aim of improving capital efficiency, project sequencing, and investment returns. . . .  Based on these preliminary assessments, the Company believes that *approximately six to nine months of additional analysis and planning are required* in order to determine the optimum processing mix for the Tasiast deposit, and the timing for developing those processing alternatives. . . .  *The Company has not finalized the Tasiast feasibility study or mine plan*, and drilling results processed to date continue to demonstrate significant exploration potential supporting a world class mine.

*Id.* ¶¶ 131–133 (emphasis added).  During a conference call on January 17, 2012—the close of the Class Period—Burt and Barry confirmed the delayed schedule.  They announced that Kinross "expect[ed] to record a material non-cash accounting charge primarily related to the goodwill recorded for the Tasiast mine in connection with the 2010 Red Back acquisition."  *Id.* ¶¶ 134– 135.

### C.  Discussion

#### 1.  Analysis of Austin's Theories of Scienter

In moving to dismiss, Kinross argues that Austin has not adequately pled two required elements of § 10(b):  (1) that it made a material misrepresentation or omission; and (2) that it did so with scienter.  Because the analysis of these asserted deficiencies differs as between Kinross's statements regarding due diligence and those regarding the Tasiast development schedule, the Court will address those areas separately.  At the outset, however, the Court addresses an issue common to both sets of statements:  the arguments available—and unavailable—to Austin, on the facts as pled, in defending its claim to have adequately pled scienter.

To plead the "strong inference that the defendant acted with the required state of mind" required by the PSLRA, a plaintiff in a § 10(b) and Rule 10b–5 action must demonstrate intent "to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 313 (citation omitted).  To do so, a plaintiff can show either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.

To show motive and opportunity, Austin must allege that Kinross or the Individual Defendants "benefitted in some concrete and personal way from the purported fraud."  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (prolonging time in position of authority or desire for increased incentive compensation inadequate motives).

Here, Austin has not come close to adequately alleging that defendants had a motive to make fraudulent misstatements.  Austin has not alleged that any of the defendants sold company stock in advance of Kinross's alleged corrective disclosures, or, for that matter, that they directly profited in any way from the alleged misstatements and omissions.[4]  *See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (scienter insufficiently pled where "complaint identifies no personal interest sufficient to establish motive").

Austin instead contends that the Individual Defendants were motivated, generally, by a desire for increased compensation, Am. Compl. ¶¶ 158–160, to assure that the company closed on the acquisition of Red Back, *id.* ¶¶ 148–149, or to ensure that an August 2011 debt offering went ahead, *id.* ¶¶ 156–157.  These motives are neither concrete nor personal to the defendants.  Rather, the motives of increased compensation and to assure that the company completed its announced initiatives are common to corporate officers.  *See Saltz v. First Frontier, L.P.*, 485 F. App'x 461, 464 (2d Cir. 2012) (summary order).  Nor is a "company's desire to maintain a high bond or credit rating" in order to "maximize the marketability" of a debt offering a sufficient motive for fraud.  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813–14 (2d Cir. 1996); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price—even if such a drop would allegedly threaten the 'survival' of a company—is far too generalized (and generalizable)

---

[4] Austin does allege that former Red Back CEO Richard Clark sold his shares in March and June 2011.  Am. Compl. ¶¶ 172–173.  But Clark is not a defendant here, and his sale of stock, without more, is insufficient to allege motive.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *see also Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1190 (S.D.N.Y. 1996).

to allege the proper 'concrete and personal' benefit required by the Second Circuit."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).  The facts pled therefore do not provide a sufficient basis on which a finder of fact could find scienter, via motive and opportunity, for either set of alleged misstatements.  Accordingly, the Court rejects Austin's allegations of scienter, to the extent premised on a theory of motive and opportunity.

Austin's alternative argument for scienter is based on recklessness, "a sufficiently culpable mental state for securities fraud in this circuit."  *ECA*, 553 F.3d at 198.  Recklessness is defined as "'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Id.* (quoting *Novak*, 216 F.3d at 308).  A plaintiff may raise a strong inference of scienter by showing strong circumstantial evidence of recklessness or conscious misbehavior; although, where no motive to commit fraud has been shown, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.  To support a finding of recklessness, a plaintiff may rely on allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).  Austin argues that both of those circumstances are present here, as to both categories of alleged misstatements.

Importantly, however, in arguing for scienter on recklessness grounds, Austin claims that knowledge of all aspects of the Tasiast mine is properly imputed to all Individual Defendants, because that mine was a "core business operation" of Kinross.  Am. Compl. ¶¶ 150–155.  The law, however, provides at best qualified support for that theory of scienter.  The core operations doctrine was recognized in *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989), before the passage, in

25

1995, of the PSLRA.  The Second Circuit has yet to rule definitively on whether that doctrine is

viable under the PSLRA, *see Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012)

(summary order) ("[W]e have not yet expressly addressed whether, and in what form, the 'core

operations' doctrine survives as a viable theory of scienter."), and courts in this district are

divided in how to apply the doctrine, *see In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326,

352–53 (S.D.N.Y. 2011) (collecting cases).  The Second Circuit, however, has suggested that it

approves of a modified approach under which the core operations doctrine can "provide

supplemental support for allegations of scienter, even if [it] cannot establish scienter

independently."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir.

2011) (summary order).  In the absence of surer guidance, the Court will follow this sensible

intermediate approach.  *Accord In re Wachovia*, 753 F. Supp. 2d at 352–53 ("In the absence of

Circuit guidance, the Court considers 'core operations' allegations to constitute supplementary

but not independently sufficient means to plead scienter.").  And the Court must consider other

reasonable inferences alongside a plaintiff's inference of knowledge of core business operations:

"[T]he fact that the Court *may* make such an inference does not mean that such an inference

necessarily would be the most compelling under *Tellabs*."  *Dobina v. Weatherford Int'l Ltd.*, No.

11 Civ. 1646 (LAK), 2012 WL 5458148, at *11 (S.D.N.Y. Nov. 7, 2012).

Guided by these overarching principles, the Court turns to analyze whether Austin has

stated a claim as to each of the two categories of alleged misstatements.

### 2.   Kinross's Statements as to Its Due Diligence

To the extent that Austin's claim of fraud is based on Kinross's statements touting its

"exhaustive" due diligence as to the Tasiast mine, Austin does not state a claim.  That is for two

reasons.  First, with the arguable exception of one alleged misstatement, addressed at the end of

this section,[5] Kinross's statements are not actionable misstatements.  Second, Austin has failed

adequately to allege scienter as to any alleged misstatement.

(a) **Non-actionable statements:**  Kinross's statements about its diligence fall into two

categories: (1) general comments about the extent and quality of the company's due diligence,

and (2) specific statements detailing what Kinross did as part of this diligence.

Kinross's general statements about its due diligence are fairly characterized as optimistic

generalizations, or "puffery."  And such "expressions of puffery and corporate optimism do not

give rise to securities violations," because companies "are not required to take a gloomy, fearful

or defeatist view of the future."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation

omitted).  "Statements are properly classified as 'puffery' when they are 'too general to cause a

reasonable investor to rely upon them.'"  *In re Austl. & N.Z. Banking Grp.*, 2009 WL 4823923,

at *11 (quoting *ECA*, 553 F.3d at 206).  To be sure, there is an important limitation on this

principle:  "[O]ptimistic statements may be actionable upon a showing that the defendants did

not genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was

without a basis in fact or the speakers were aware of facts undermining the positive statements),

or that the opinions imply certainty."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221,

239–40 (S.D.N.Y. 2006) (citing *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d

Cir. 1998) ("*In re IBM*").  Thus, as to Kinross's statements generally lauding its due diligence

efforts, Austin must do more than allege that the statements were false and misleading.  It must

demonstrate with specificity why and how Kinross appreciated that that was so.  *See ECA*, 553

F.3d at 206; *Novak*, 216 F.3d at 315.

---

[5]  The arguable exception is Kinross's statement that "we have done far more homework than
one would typically see in a significant acquisition."  Am. Compl. ¶ 104.  *See* discussion *infra* at
pp. 32–33.

The general statements on which Austin seizes were made in pre-merger press releases, where Kinross stated that it had had "the advantage of doing . . . very detailed and in-depth due diligence," Am. Compl. ¶ 102, and described that diligence as "exhaustive," *id.* ¶ 107.  In those statements, Kinross attributed its optimistic projections about the acquisition to its diligence: "We have developed an understanding of the assets that we believe is much more comprehensive than the Street has."  *Id.* ¶ 102.  Kinross also stated that, on the basis of its "extensive due diligence," it believed it could "outperform those consensus numbers."  *Id.*

These rosy but general portraits of Kinross's due diligence do not rise to the level of an actionable misstatement.  They are puffery.  *See Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, No. 11 Civ. 398 (GBD), 2012 WL 4616958, *7 (S.D.N.Y. Sept. 28, 2012) (finding that optimistic comments about due diligence were puffery).  The Second Circuit has held, in fact, in a closely analogous context, that generalized statements touting the quality of a company's risk management process are puffery.  *See, e.g., ECA*, 553 F.3d at 205–06 (statements that "'risk management processes . . . are highly disciplined and designed to preserve the integrity of the risk management process'" were "merely generalizations regarding [defendant's] business practices" and constituted inactionable puffery); *cf. San Leandro Emerg. Med. Grp.*, 75 F.3d at 811 (statements that Philip Morris was "'optimistic' about its earnings and 'expected' Marlboro to perform well" constituted puffery).

As to the more specific statements made by Kinross about its diligence, Austin has not alleged that any of these are false.  To be sure, representations about due diligence anchored in specific factual claims may be actionable.  *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10 Civ. 440 (LAK)(HBP), 2012 WL 3191860, at *20–21 (S.D.N.Y. Feb. 9, 2012) (misrepresentation may be actionable where it is an "affirmative representation of a then-existing

fact"); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,

757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (representations concerning due diligence were not

puffery because they were fact-based expressions of opinion).  But although Austin assails

specific statements made by Kinross about its due diligence, it does not explain concretely why

the specific factual representations that Kinross made about its "exhaustive due diligence" were

false.  For example, in its September 1 statement about its "exhaustive due diligence on Red

Back," Kinross listed specific diligence steps that it had taken.  These included "multiple site

visits," "twinning of existing Red Back drill holes," "extensive metallurgical testing," and

"receiv[ing] third party opinions."  Am. Compl. ¶¶ 106–107.  Austin does not allege that Kinross

did not, in fact, take each of these steps.

Moreover, although Austin assails Kinross's due diligence as insufficient, it does so

largely on the basis of details of that diligence disclosed by Kinross.  For example, Austin faults

Kinross for not drilling to 700 meters of depth during the due diligence period, but it was Kinross

that disclosed that it had drilled less far down (430 meters).  *See* Giuffra Decl. Ex. 5, at 1.

Similarly, Austin faults Kinross for having drilled test wells at only one site, but Kinross

disclosed precisely this limitation before the merger.  *Id.* ("[T]hese preliminary conceptual

estimates are based on data gathered from exploring only 8 kilometres of Tasiast's 70 kilometre

greenstone belt . . . .").  *See Lighthouse Fin. Grp.*, 2012 WL 4616958, *7 ("But Plaintiffs do not

point to any statement, during the period in which RBS was supposed to be doing due diligence,

in which any Defendant states that RBS had done the exhaustive due diligence that Plaintiffs, in

hindsight, might have preferred.").

At argument, Austin focused extensively on Kinross's disclosure on March 31, 2011—

after the acquisition of Red Back—that the ore that it found during its test drilling was "relatively

hard"; Austin argues that Kinross should have disclosed that that ore was "very hard."   Tr. 55–
56.   But Austin's view that Kinross should have used a more forceful adjective to qualify the
word "hard" does not make the formulation it chose actionable.   Austin does not allege, for
example, that the terms "relatively hard" and "very hard" when applied to ore are industry terms
of art that have fixed meanings, or that the data that Kinross uncovered was inconsistent with the
formulation ("relatively hard") that it chose.   Austin does not even sufficiently allege that
"relatively hard" was a "half-truth," or a "literally true statement[] that create[d] a materially
misleading impression."   *Cf. S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other
grounds*, 133 S. Ct. 1216 (2013).   Section 10-b is not concerned with such subtle disagreements
over adjectives and semantics.   *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d
378, 392 (S.D.N.Y. 2010) ("semantic distinction [between 'routinely' and 'systematically'] is not
persuasive"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994 (LTS)(AJP), 2009 WL
464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives are nothing more than puffery").

(b) **Inadequate allegations of scienter:**   As to both Kinross's general and specific
statements about its due diligence, Austin has not alleged, other than in conclusory fashion, that
Kinross did not genuinely or reasonably believe those statements at the time it made them.   That
is an independently sufficient reason for the Court's holding that Austin's lawsuit must be
dismissed to the extent based on the due diligence statements.

As to Kinross's general statements, which the Court has held non-actionable, Austin
merely argues that because defendants were aware of the extent of the diligence, they were also
aware that the diligence was inadequate.   However, the facts alleged do not bear that out.   Austin
has quoted several former employees to the effect that they believed that Kinross's due diligence
was inadequate.   *See, e.g.*, Am. Compl. ¶¶ 47–51.   But Austin has not alleged that any of those

former employees communicated those concerns to Kinross or an Individual Defendant, let alone that they persuaded the defendants (or notified them of facts demonstrating) that the diligence was inadequate.

On the basis of the pleadings, there is a clear difference of opinion between Kinross, on the one hand, and these former employees, on the other, as to the adequacy of the company's diligence.  However, differences of opinion, even stark differences, between employees do not reveal scienter.  That is particularly so where, as here, no pleading specifically alleges that the contrary views were communicated to the company or its officers.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004) ("[T]he mere fact that the Planning Manager 'anticipated' a delay in March 2000 does not establish that Flag or the individual defendants had similar foresight.").

Further, as noted, statements of judgment, evaluation, or opinion are actionable only if the plaintiff makes a non-conclusory allegation that the defendant did not truly believe them at the time they were made.  *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) ("Subjective statements can be actionable only if the 'defendant's opinions were both false and not honestly believed when they were made.') (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011))); *In re IBM*, 163 F.3d at 107 ("Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." (citations omitted)); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 313 (S.D.N.Y. 2011) ("Such statements are not actionable unless it is alleged sufficiently that the speaker did not truly believe them when they were made.").  Austin makes no such allegations here.

As to Kinross's specific statements about due diligence, as noted, Austin, does not make any allegations that these were even false, with one arguable exception. It follows that Austin cannot allege that Kinross or the individual defendants were aware of specific facts showing these statements to be false.

The one specific statement about due diligence as to which Austin articulates a plausible basis for claiming falsity is defendant Burt's statement, in a conference call on August 5, 2010, that "we have done far more homework than one would typically see in a significant acquisition." Am. Compl. ¶ 104. Austin alleges that that statement was a misrepresentation because Kinross's diligence was, in fact, "woefully inadequate," based on statements of former employees. *See id.* ¶¶ 47–55. Other than simply alleging that Burt's "homework" statement was false, Austin has failed to point to evidence showing that it was actually false, or that Kinross knew or had reason to know it was false.

Austin has offered no allegation that, in fact, other significant acquisitions whose diligence was done by or known to Kinross were pursued only after materially greater diligence. Notably, in the context of its challenges to the mining schedule, Austin points to a report by IPA, "the preeminent mining consultant in project evaluation," as support for its claim that Kinross deviated from the typical mine development schedule. *See* discussion *infra* p. 43; Am. Compl. ¶¶ 67–77. However, Austin makes no analogous allegations with regard to how Kinross's due diligence compared to that done by others. And the IPA report, as described in the Amended Complaint, does not recite the typical "homework" done in a significant acquisition, or list the types of diligence commonly done before a company in the gold-mining industry is acquired. Absent such comparisons, or similar allegations tending to show that Kinross in fact did less due diligence than is typical, Austin has failed to allege a material misstatement.

Furthermore, Austin has not alleged that Kinross knew, or had reason to know, that it had done materially less homework than was customary.  Although Austin cites to former employees' statements, none contrast Kinross's due diligence to that done on comparable mining projects.  And, as discussed above, there is no allegation that any of those former employees communicated their concerns to Kinross, let alone that they persuaded Kinross or any Individual Defendant that Kinross's diligence was wanting.

Thus, even as to the single specific statement about due diligence that Austin alleges is false, it has failed to allege scienter or that it is an actionable misstatement.

### 3.  Kinross's Statements as to the Tasiast Schedule

Kinross's alleged misstatements as to the Tasiast schedule are of a different character. Those statements—at least those that articulated a specific development schedule—cannot be set aside as puffery.  Rather, Kinross's statements about the schedule were specific.  And they were self-evidently material:  Kinross's statements about the schedule for developing the Tasiast mine stood to affect, significantly, investors' expectations about the mine's viability and profitability. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301–02 (S.D.N.Y. 2009) ("Cost estimates, a forecast that the Project will be commercially viable, or a comment that the Project's budget and construction schedule are unchanged are too specific to be considered mere puffery.").

In seeking dismissal of Austin's Amended Complaint to the extent based on these statements, Kinross instead makes two other arguments: (1) that these statements are not actionable under the "bespeaks caution" doctrine, and the related PSLRA provision protecting forward-looking statements; and (2) that Austin has not satisfactorily alleged that Kinross's statements about the Tasiast schedule were made with scienter.

The "bespeaks caution" doctrine generally protects forward-looking statements that adequately disclose the risk factors that might cause a different outcome to occur than the one forecast by the issuer. *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 & n.8 (2d Cir. 2010). As the Second Circuit has explained, under the bespeaks caution doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading. In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Id.* (citation omitted).

The PSLRA includes a similar safe-harbor provision. It states that an issuer or underwriter

> shall not be liable with respect to any forward-looking statement . . . if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .

15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1). This provision is a "counterpart" to the bespeaks caution doctrine. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

As the Second Circuit has held, whether framed in terms of the bespeaks caution doctrine or the PSLRA safe harbor, there are limits to the protections conferred upon the issuer. Where the forward-looking language "did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss," a plaintiff may overcome such cautionary language. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). Further, generic and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that "forward-looking statements are 'subject to certain risks and uncertainties'"—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these

statements. *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order).

As to scienter, the same principles reviewed earlier apply: Scienter may be found based on a finding that the statement was made with recklessness. However, unlike statements about historical facts, in which the scienter inquiry focuses on whether the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor," *ECA*, 553 F.3d at 199, the recklessness inquiry as to forward-looking projections focuses on whether the defendants knew at the time they made these projections that they were unrealistic or unlikely to come true. Kinross's announced schedule reflects its judgment or opinion, and "[t]he *sine qua non* of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 153–54 (S.D.N.Y. 2004) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095–96 (1991)).

In alleging that a statement of opinion was a misstatement, "plaintiffs must 'allege with particularity that defendants did not sincerely believe the opinion they purported to hold,' by alleging 'provable facts to demonstrate that the statement of opinion is both objectively and subjectively false.'" *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011) (quoting *Podansky*, 318 F. Supp. 2d at 154). In analyzing whether Austin has made this showing, the dual inquiries of objective falsity and subjective scienter effectively collapse into one: whether the defendant actually believed his own stated opinion. If it is satisfactorily alleged that the defendant did not,

the elements of both falsity and scienter are met.[6]  The Court, therefore, need only determine

whether Austin has alleged that the defendants stated their opinion as to the Tasiast timetable,

knowing that this timetable did not reflect their true views as to the actual timetable.  *Cf. In re*

*Lehman Bros.*, 799 F. Supp. 2d at 313 (statements that "reflect Lehman's judgment or opinion"

"would be actionable only if plaintiffs had alleged that Lehman did not truly believe those

valuations at the time they were issued").

In making this assessment, the Court is mindful that a complaint that attacks a prediction

(or other statement of opinion) as false or misleading may not prevail based on the theory that,

because the prediction proved errant or was later discredited, no reasonable speaker could have

subjectively believed in it at the time it was made.  Rather, a plaintiff must adequately allege that

the prediction was not subjectively believed by the speaker *when stated*.  To second guess

statements of opinion based on subsequent fact would effectively, and improperly, allege "fraud

by hindsight," a theory which the Second Circuit has rejected.  *See Stevelman v. Alias Research,*

*Inc.*, 174 F.3d 79, 85 (2d Cir.1999); *Podany*, 318 F. Supp. 2d at 155–56.

---

[6] Judge Lynch has explained why, in a misstatement of opinion case, these two inquiries
collapse:

> While in a misstatement of fact case the falsity and scienter requirements present
> separate inquiries, in false statement of opinion cases such as these, the falsity and
> scienter requirements are essentially identical.  That is because a material
> misstatement of *fact* is alleged by pointing to the true fact about the world that
> contradicts the misstatement.  But even if the statement of fact ("the company
> made x million dollars in profit last year") turns out to be objectively false, it
> could have been made in good faith; subjective intent to commit fraud is a wholly
> separate inquiry from whether the statement is objectively true.  However, a
> material misstatement of *opinion* is by its nature a false statement, not about the
> objective world, but about the defendant's own belief.  Essentially, proving the
> falsity of the statement "I believe this investment is sound" is the same as proving
> scienter, since the statement (unlike a statement of fact) cannot be false at all
> unless the speaker is knowingly misstating his truly held opinion.

*Podany*, 318 F. Supp. 2d at 154.

In the Court's assessment, the application of these principles yields different outcomes when applied, on the one hand, to Kinross's statements about the projected Tasiast schedule made up until the August 10, 2011 news release announcing the nine-month delay of the feasibility study; and, on the other, to Kinross's statements about that schedule made on and after August 10, 2011.  Accordingly, the Court analyzes these statements separately.

(a) **Statements made before August 10, 2011**:  To the extent Austin's case rests on Kinross's forward-looking alleged misstatements as to the Tasiast schedule before August 10, 2011, it fails to state a claim.  A number of the statements in question are protected by the bespeaks caution doctrine and the PSRLA safe harbor.  In addition, Austin has failed satisfactorily to plead scienter as to any of them.

As to the first point:  Kinross's forward-looking statements in its September 1, 2010, and February 16, 2011 news releases, *see* Am. Compl. ¶¶ 106, 109, are protected by the bespeaks caution doctrine and the PSLRA safe harbor.  Those releases include a "[c]autionary statement on forward-looking information," which adequately warns investors of potential risk factors.  *See* Giuffra Decl. Ex. 7, at 4 (listing cautionary factors for September 2010); *id.* Ex. 8, at 13 (listing cautionary factors for February 2011).[7]

Austin argues that Kinross did not publish adequate cautionary language, because the language did not specifically warn of the dangers that eventually derailed the Tasiast project, *i.e.*, the hardness of the rock and quality of the ore at Tasiast.  Austin Br. 22–23.  But Kinross did warn of Tasiast-specific risks, including "the accuracy of . . . mineral reserve and mineral

---

[7] As noted, because the Amended Complaint quotes and relies upon statements Kinross made in its news releases and during the conference calls with analysts, the Court may properly consider the full transcripts of those calls and of the referenced SEC filings without converting Kinross's motion to dismiss into one for summary judgment.  *See* note 1, *supra*; *see also Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232 n.3 (S.D.N.Y. 2009).

resource estimates"; "the viability of the Tasiast and Chirano mines, and the development and expansion of Tasiast and Chirano mines on a basis consistent with Kinross and Red Back's current expectations"; and "labour and materials costs increasing on a basis consistent with Kinross' current expectations."  Giuffra Decl. Ex. 7, at 4; *id.* Ex. 8, at 13.  Austin is correct that the cautionary language in Kinross's news releases did not specifically identify the possibility that unusually hard rock at Tasiast was a risk factor that could delay or disrupt Kinross's schedule.  But Kinross's cautionary language about the mine's viability was sufficiently comprehensive to have meaningfully warned investors that there were potential contingencies, including geologic ones, that could retard development of the mine.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (noting that PSLRA legislative history specifically notes that "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor").

For similar reasons, Kinross's statements during its February 17, 2011 conference call are protected as forward-looking.  At the beginning of the call, Kinross's moderator stated that the speakers would "be making forward-looking statements during the presentation," and directed the call participants to the cautionary language in Kinross's February 16, 2011 news release for a discussion of the relevant risks, uncertainties, and assumptions.  Giuffra Decl. Ex. 6, at 1.  The February 17, 2011 cautionary statement thus went well beyond the pat, boilerplate caution that the Second Circuit has held insufficient to put investors on notice of the pertinent risk factors. *See Ill. State Bd. of Inv.*, 369 F. App'x at 265 n.3.  That is because the previous day's specific cautionary language, which it incorporated by reference, was more than sufficient to bring it within the protection of the bespeaks caution doctrine.  *See, e.g.*, *Fort Worth Emp'rs' Ret. Fund*,

615 F. Supp. 2d at 233 (reference at beginning of conference call to risk disclosure in same day's press release sufficient to satisfy the PSLRA safe harbor); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (cautionary language on conference call sufficient where it warned that statements were "forward-looking and are subject to a number of risks and uncertainties that could cause actual results to differ materially from the statements made"). [8]

As to the second point:  Austin fails to satisfactorily allege that Kinross's statements about the Tasiast schedule up until August 10, 2011, *see* Am. Compl. ¶¶ 112, 116–118, were made with scienter.  That is because Austin has failed to allege facts sufficient to show that at the time the statements were made, the defendants either had no intention of meeting the announced schedule or that they were hewing to that schedule recklessly, in the face of facts that made it unrealistic or impossible to meet that schedule.

To be sure, Austin claims that Kinross knew or should have known that the schedule as announced could not be met.  However, its factual allegations are insufficient to conclude that, before August 10, 2011, Kinross lacked a reasonable basis to believe it could meet the announced schedule.  *See City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10 Civ. 00967 (GBD), 2011 WL 7158548, at *9 (S.D.N.Y. Sept. 6, 2011) ("[N]one of the statements identified by Plaintiff can be reasonably construed to be an admission that Defendants actually possessed knowledge inconsistent with their public statements *at the time that the public statements were*

---

[8] To be sure, on the record before the Court on the motion to dismiss, it has not been shown that Kinross's statements regarding the Tasiast timetable after February 17, 2011, and leading up to the August 10, 2011 conference call, included similar cautionary language.  Counsel have not furnished the Court with the transcripts of the other conference calls during this period; and it appears that the news releases during this period that addressed the development timetable did not include such cautionary language or incorporate by reference, at least expressly, the earlier cautionary language.  *See, e.g.*, Giuffra Decl. Exs. 12, 14.  However, because Austin has not adequately pled that these statements were made with scienter, Austin fails to state a claim based on these statements for that separate reason.

*made*." (emphasis in original)).  On the contrary, Kinross had disclosed numerous times that the planned schedule was a rapid and ambitious one.  *See, e.g.*, Am. Compl. ¶¶ 102 ("accelerated exploration and development program"), 106 ("expects to fast-track engineering and project development work"), 123 ("aggressive timetable"); Giuffra Decl. Ex. 11, at 4 ("aggressive drilling campaign").  And development schedules, especially aggressive ones, change over time and in response to a variety of factors.  *See, e.g.*, *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) ("If something is 'on track' it is reasonable to assume that it could go 'off track.'"); *ABF Capital Mgmt. LP v. Askin Capital Mgmt.*, 957 F. Supp. 1308, 1324 (S.D.N.Y. 1997) ( "bad forecasting alone is not actionable" for common law fraud claim, which applies same pleading standard).

Austin's Amended Complaint instead draws force from hindsight:  Although today it is known that the schedule was not met, Austin has not sufficiently alleged that defendants, at least until August 10, 2011, knew or were reckless in setting or adhering to that schedule.  To permit Austin's claim to go forward based on Kinross's later abandonment of the schedule would effectively permit plaintiffs to allege "fraud by hindsight."  That, plaintiffs may not do.  *See* *Stevelman*, 174 F.3d at 85; *City of Roseville Emps.' Ret. Sys.*, 2011 WL 7158548, at *10 ("Plaintiff's burden to plead scienter is not satisfied by merely demonstrating that Defendant [] made a false statement because, absent additional factual allegations, Plaintiff is not entitled to an inference that Defendant [] must have known his statement was false.")

In its Amended Complaint, Austin relies heavily on former employees who opine that the development schedule announced for Tasiast was impossible to meet, based on the hardness of the rock, the quality of the ore, and the costs of construction.  *See, e.g.*, Am. Compl. ¶¶ 48, 53, 78, 83–85; Austin Br. 31–33.  However, none of these former employees claims to have spoken

with or otherwise notified Kinross, or any Individual Defendant, of that opinion.  *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *San Leandro*, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.").  Nor does Austin allege that Kinross or the Individual Defendants harbored a secret, but undisclosed, actual schedule for Tasiast.  *City of Roseville Emps.' Ret. Sys.*, 2011 WL 7158548, at *10 (claims dismissed where plaintiff failed to allege facts demonstrating that "at the time various statements were made about release dates, Nokia had no reasonable basis to believe that it could meet those deadlines even in light of the alleged software problems, or that Nokia had no intention of meeting the announced release dates"); *In re Bank of Am.*, 757 F. Supp. 2d at 323 (scienter sufficiently alleged where defendants privy to "secret Disclosure Schedule"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197–98 (S.D.N.Y. 2010) (scienter adequately alleged when internal communications about pursuing high-risk loans contradicted public statements of conservative investment philosophy); *Fort Worth Emp'rs' Ret. Fund*, 615 F. Supp. 2d at 228 (claims dismissed where no allegations that defendants' statements were "directly contradicted by contrary evidence known to the defendants").

For these reasons, to the extent Austin's claim is based on statements made by Kinross or the Individual Defendants before August 10, 2011, Austin fails to state a claim.

**(b)  Statements on and after August 10, 2011**:  Although the matter presents a close question, the Court is persuaded that Austin has stated a claim to the extent that it alleges that Kinross's statements about the Tasiast development schedule on August 10, 2011, and November 2, 2011, were materially misleading.

41

On August 10, 2011, as noted, Kinross announced that the feasibility study for Tasiast would be delayed at least six to nine months (from mid-2011 to first quarter 2012).  But Kinross, and Individual Defendants Burt and Thomas, simultaneously stated that notwithstanding this delay, and notwithstanding the fact that Kinross had previously acknowledged that its development schedule was aggressive, the schedule for construction and production of Tasiast was unchanged.  Am. Compl. ¶¶ 120–124.  On November 2, 2011, Kinross twice again confirmed that schedule.  In a press release, Kinross stated that its construction and operations were still on schedule; and, later that day, pressed by an analyst in a conference call, CEO Burt hammered home the point, stating that "[t]here's no change intended in the timing," and that "[w]e're on or ahead of schedule currently, so we have no reason to change that, and we're on track today."  *Id*. ¶¶ 126–129.  Austin's claim is that Kinross and the Individual Defendants stubbornly hewed to the schedule as earlier announced—to avoid unsettling the markets any more than they had been by the delay in the feasibility schedule, and, presumably, to forestall second-guessing and criticism, or worse—even though Kinross and these executives realistically had to appreciate, under the assembled circumstances, that the former schedule was no longer realistic.

Although these statements by Kinross, Burt, and Thomas about the Tasiast construction and production schedule are statements of opinion about the course of future events, they are not protected as forward-looking.  First, the record does not reflect that Kinross issued cautionary language in connection with its news releases and conference calls of August and November 2011.  *See* Giuffra Decl. Exs. 12, 14.  Second, even if there had been such cautionary language, Austin has alleged sufficient facts to show that defendants had to appreciate by August 2011 that a material delay of the prior schedule for construction and production was likely, and that that

schedule was no longer realistic.  And it is well-settled that cautionary language cannot protect against the "omission of present fact."  *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 142; *see also Slayton*, 604 F.3d at 770 ("[C]autionary language that is misleading in light of historical fact cannot be meaningful. . . .").  "The law is well settled . . . that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."  *Gabelli*, 653 F.3d at 57.

The basis for this conclusion is as follows:  First, long before August 2011, Kinross had publicly acknowledged that the Tasiast project was operating on an extremely aggressive schedule, with construction scheduled to start in mid-2012 and production in early 2014.  *See, e.g.*, Am. Compl. ¶¶ 102 ("accelerated exploration and development program"), 106 ("expects to fast-track engineering and project development work"; Giuffra Decl. Ex. 11, at 4 ("aggressive drilling campaign").  These projections presupposed that the feasibility study for the project would be complete by mid-2011.  That would have left approximately a year following the completion of the study for Kinross to plan and prepare for the start of construction, in mid-2012.  In its Amended Complaint, Austin has credibly explained that a feasibility study provides a foundation for a company's later construction work.  Austin cites from a report on mining project development by IPA, "the preeminent mining consultant in project evaluation," *see* Am. Compl. ¶¶ 67–77, to the effect that, in the mining industry, the feasibility study stage is when engineering plans are developed, for later implementation during the construction (or "execution") phase.  *Id.* ¶¶ 69, 72–73.  In other words, the feasibility study stage necessarily precedes, and is a predicate to, the construction stage.

Kinross's initial schedule contemplated that the feasibility study would take seven months to complete (between December 2010 and July 2011).  In May 2011, three months

before announcing the delay, Kinross stated that the feasibility study was 62% complete.  Giuffra Ex. 11, at 4.  But the delay Kinross announced in August 2010 put off the completion of the feasibility study by nine months—in other words, the delay was for a longer period than Kinross had budgeted for the *entire* feasibility study from start to finish.  The delay meant that the feasibility study would now conclude in the first quarter of 2012.  On the schedule Kinross had previously announced, that left just one quarter before project construction was to commence.  In other words, if the construction schedule was not altered, the time for Kinross to pivot from the study to commencement of construction work would be cut by 75 percent.  The fact that Kinross was announcing, relatively late in the process, a long delay of the penultimate pre-construction step in its tightly scheduled development plan, by itself, logically supports the inference that the previous schedule was no longer realistic.  In that context, Kinross's statements doubling down on the old schedule—including Burt's declaration that the company had "no reason to change" the existing schedule—are fairly pled to have been facile and insincere denials.

Second, the Amended Complaint, citing information supplied by former employees, identifies concrete facts known to Kinross, but not the public, as of August 2011 that made it all the more likely that the old construction schedule could no longer realistically be met.  One former employee (FE-2) was a senior manager of the group assigned to purchase equipment needed to process ore at Tasiast, and was working at Kinross until the end of 2011.  Am. Compl. ¶ 50.  FE-2 is quoted as stating that Kinross encountered unusually hard ore at Tasiast from "early on," and that, due to the cost associated with extraction, an initial feasibility study for Tasiast had suggested a "negative rate of return" for the mine.  *Id.* ¶ 86.  Another former employee (FE-1) was a senior manager at Kinross during 2011, and was responsible for designing and ordering the equipment necessary to supply electrical power to Tasiast.  *Id.* ¶ 47.

FE-1, too, stated that the ore uncovered at Tasiast had proven unexpectedly hard, and that Hatch

Engineering Group, a firm that was consulting for Kinross regarding engineering and other

issues affecting the Tasiast mine, had informed FE-1 that due to the hardness of the ore

encountered in initial drilling, it would be more far more costly for Kinross to extract gold from

the mine, and that doing so would require an updated design program that utilized greater

electrical power.  *Id.* ¶¶ 47, 86.

Viewed on their own terms, these specific factual allegations of unexpected obstacles

affecting the Tasiast plan supply a coherent explanation for Kinross's decision to delay,

substantially, the feasibility study.  They illuminate the events that overtook Kinross's earlier

schedule for that study.  Viewed in combination with (1) the length of the delay of the feasibility

study, (2) the fact that that study was now scheduled first to be complete just three months before

the scheduled start of construction, and (3) Kinross's earlier acknowledgment that its schedule

for construction and production had little margin for error, these allegations corroborate Austin's

claim that Kinross was reckless when, in August and November 2011, it repeatedly reassured the

market that the old schedule remained on track and that there was "no reason" to change it.

In holding that Austin has stated a claim as to Kinross's statements, beginning August 10,

2011, with regard to the Tasiast schedule, the Court emphasizes that its determination on this

point is a close one.  The factors most influencing that determination are the length (nine

months) of the delay in the feasibility schedule itself and the limited margin for error that

evidently existed before that delay.  Although the Court has taken into account the statements

attributed to FE-1 and FE-2, it has discounted those statements for several reasons: (1) the fact

that these employees are not named, and therefore are, at this stage, less accountable than if

identified by name; and (2) the lack of a clearly recited foundation for FE-2's professed

knowledge of the results of the initial feasibility study.  The Court also notes that neither FE-1 nor FE-2 has stated that they told, or that any particular Kinross executive knew, of the specific discouraging facts recited, whether about the unexpected hardness of the ore at Tasiast, the unexpected engineering challenges (*e.g.*, relating to electrical power), or the unexpectedly high cost that gold extraction there would entail.  That said, these alleged facts, by their nature, would have been sufficiently consequential as to a major project of Kinross's that it is fair to infer that senior management at Kinross would have been alerted to them, if not before, then at the time a decision was made to publicly embrace anew the existing development schedule.  *See Cosmas*, 886 F.2d at 13 (inferring knowledge of new regulations in an area that represented a significant part of business); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."); *see also In re Wachovia*, 753 F. Supp. 2d at 352–53 ("'[C]ore operations' allegations . . . constitute supplementary but not independently sufficient means to plead scienter.").  For this reason, the Court has not discounted these statements altogether.

The Court accordingly holds that Austin has satisfactorily alleged that, in its statements made on August 10, 2011, and November 2, 2011, Kinross was reckless in reaffirming its previously announced schedule for the construction and operation of the Tasiast mine.  Further, Austin fairly alleges that, upon becoming aware that the old schedule was unrealistic, Kinross had a duty to correct that schedule:  By announcing such a schedule, Kinross made "the sort of definite positive projection[]" that the Second Circuit has found "'require[s] later correction' when intervening events render it misleading."  *Ill. State Bd. of Inv.*, 369 F. App'x at 264–65 &

n.2 (quoting *Time Warner,* 9 F.3d at 267); *see also In re IBM,* 163 F.3d at 110 ("A duty to update

may exist when a statement, reasonable at the time it is made, becomes misleading because of a

subsequent event." (citation omitted)).

Kinross's theory that industry-wide increases in mining costs precipitated the delay and

schedule reassessment that it announced in January 2012—an explanation Kinross articulated at

that time, *see, e.g.*, Am. Compl. ¶¶ 96, 131—does not change this result.  Austin's thesis is that

five months earlier, as of August 10, 2011, Kinross and the Individual Defendants had to

appreciate that the old schedule was unrealistic, and that it was reckless to cling to that schedule

publicly in the face of the facts known to it.  For the reasons the Court has given, Austin has

stated a claim based on that theory.  That industry-wide cost increases by January 2012 may *also*

have commended a reassessment of the project does not diminish Austin's showing that, based

on the facts known to Kinross as of August 2011, the earlier schedule had become illusory.

Further, as Austin points out, the cost factors recited by Kinross in its January 2012

announcement—"industry-wide escalation in project capital and operating costs," "increased

understanding of the Tasiast orebody," and "mining and processing rates"—had been known to

Kinross, at least to some degree, as of August 2011.  *See* Giuffra Decl. Ex. 10, at 16-5

(December 2010: ore "relatively hard"); *id.* Ex. 12, at 5 (August 2011: "upward pressure on

capital and operating costs" and revising total cost estimate up by $500 million–$1 billion); *id.*

(August 2011: "assay result turn-around times continue to be slow").  Kinross's memorandum of

law itself notes that industry-wide increases in costs "drove up costs *throughout* 2011."  Kinross

Br. 31 (emphasis added).  Thus, regardless whether the decision to delay the Tasiast

development schedule is seen as having been principally caused by site-specific impediments or

by industry-wide cost factors, Austin has alleged adequately that Kinross, as of August 2011,

knew or had to appreciate that the schedule it had announced a year earlier was no longer viable. It has adequately pled that Kinross's failure to update or revise the schedule between then and January 2012 was reckless. *Novak*, 216 F.3d at 308–09. It remains to be seen, of course, and discovery will test, whether that thesis is supported by admissible evidence.

### 4.  Individual Defendants

Austin alleges that Burt, Barry, Masterman, and Thomas are each liable both as primary violators under § 10(b) and as control persons under § 20(a). It is permissible for Austin to plead Individual Defendants' liability under both theories. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 412–13 (S.D.N.Y. 2005) ("Plaintiffs are not precluded from pleading that the Defendants are both primary violators and control persons.").

**(a)  Primary Liability**: As against Burt and Thomas, Austin has supplied factual allegations to support its § 10(b) claims. They are alleged to have made materially misleading statements on conference calls in August and November 2011. In addition, Burt's commentary was quoted in the news releases of August and November 2011. *See* Giuffra Decl. Ex. 12, at 2; *id.* Ex. 14, at 2. As CEO and senior vice president of projects, respectively, Burt and Thomas are alleged to have been sufficiently involved in the Tasiast development project that, as of August 2011, they knew or must have known that the announced schedule was no longer viable.

As against Barry and Masterman, however, Austin's § 10(b) claims present a closer question, because Austin has not alleged they *themselves* made any misstatements. Since 1998, the Second Circuit has held that "a secondary actor cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998). That is because "a defendant

must actually make a false or misleading statement in order to be held liable under Section 10(b)"; merely aiding and abetting does not trigger liability. *Id.*

Until recently, however, the Second Circuit seemed to have recognized an exception to this rule, under which a corporate insider—as opposed to a secondary actor or outsider, such as a lawyer or accountant—could be held liable for being "involved" in disseminating misleading statements, without requiring public attribution of the statements to him. In *In re Scholastic Corp. Sec. Litig.*, the Second Circuit held that an individual defendant's position as vice president for finance and investor relations, and his involvement in "the drafting, producing, reviewing and/or disseminating of the false and misleading statements," were sufficient to allege that the misleading statements were attributable to him. 252 F.3d 63, 75–76 (2d Cir. 2001). Under the approach taken in *Scholastic*, the facts alleged here—Barry and Masterman's positions as CFO and senior vice president of exploration, respectively; Masterman's participation in conference calls; and both defendants' dissemination and approval of the misleading statements—would suffice to allege § 10(b) liability.

In 2010, however, the Second Circuit reemphasized the requirement of attribution. In *Pacific Investment Management Co. v. Mayer Brown LLP* ("*PIMCO*"), the court helpfully canvassed its precedents, and concluded that "attribution is required for secondary actors to be liable in a private damages action for securities fraud under Rule 10b–5." 603 F.3d 144, 152 (2d Cir. 2010). At the same time, the Second Circuit rejected a "creator standard" for secondary actor liability under Rule 10b–5. *Id.* at 155. The Court reserved decision on the issue of whether attribution is required for a corporate insider to be liable, while suggesting it may not be:

> Because this appeal does not involve claims against corporate insiders, we intimate no view on whether attribution is required for such claims or whether *Scholastic* can be meaningfully distinguished from *Wright* and *Lattanzio* [*v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)]. There may be a justifiable

basis for holding that investors rely on the role corporate executives play in issuing public statements even in the absence of explicit attribution.

*Id.* at 158 n.6.

In light of this authority, district courts in this Circuit have since expressed uncertainty as to how to treat corporate insiders who are not alleged personally to have made misstatements. *See, e.g.*, *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 371 (S.D.N.Y. 2011) (McMahon, J.) ("Even if something remains of the Circuit's decision in [*Scholastic*], after *PIMCO* (and I am not sure that anything does) . . . ."); *In re Celestica Inc. Sec. Litig.*, No. 07 Civ. 312 (GBD), 2010 WL 4159587, at *3 n.3 (S.D.N.Y. Oct. 14, 2010) (Daniels, J.) (noting that the Second Circuit has not resolved the issue of an attribution requirement for corporate insiders), *rev'd on other grounds sub nom. New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 475 (S.D.N.Y. 2010) (Scheindlin, J.) ("*PIMCO* did not foreclose liability in such cases, nor did it provide much guidance as to the circumstances under which this indirect corporate insider liability might arise."); *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *7–8 & n.111 (S.D.N.Y. June 28, 2010) (Scheindlin, J.) ("[T]o the extent *Scholastic* can be distinguished, and thus, survives *PIMCO*, its application appears limited to claims against corporate insiders at the firm which issued the securities that are the subject of the litigation.").[9]

---

[9] Before *PIMCO*, Judge Lynch proposed a possible reconciliation of *Scholastic* and *Wright*:

> [A] plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have *made* the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have *relied* on it as if the statement had been attributed to the defendant.

Given this uncertainty, the Court declines to dismiss Austin's § 10(b) claims against Barry and

Masterman at this time.  At a suitable time as the case proceeds, the Court will welcome from

further briefing from the parties on this point.

  **(b)  Control Person Liability**:  Austin also alleges that the Individual Defendants are

liable as "control persons" under § 20(a) of the Exchange Act.  Section 20(a) provides as

follows:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a)(1999).  "[A]bsent a primary violation, a plaintiff cannot state a claim of

control person liability under section 20(a)."  *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246

(S.D.N.Y. 1999).

  "To plead control over a primary violator, a plaintiff must allege 'that the defendant

possessed the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.'"  *In re BISYS Sec.*

*Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (quoting *S.E.C. v. First Jersey Sec. Inc.*, 101

F.3d 1450, 1472–73 (2d Cir. 1996)).  However, "[a]llegations of control are not averments of

fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA.  They

need satisfy only the less stringent requirements of Fed. R. Civ. P. 8."  *Id.*  Here, Austin has

plausibly pled that the four Individual Defendants possessed control over Kinross, a primary

---

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 333 (S.D.N.Y. 2004) (citing *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002)); *see also Sgalambo*, 739 F. Supp. 2d at 475 ("*PIMCO*'s broader discussion of the attribution requirement in securities fraud cases establishes that reliance is of central importance in considering whether to extend liability to defendants who did not make the statements at issue.").

violator.  Each Individual Defendants is alleged to have held a high position as an officers and/or director of Kinross, and each is alleged to have supervised the development at Tasiast in some way.

Kinross, in a footnote, argues that Austin's control person claims must be dismissed for failure to allege a primary violation by any Individual Defendant.  Kinross Br. 40 n.7.  But, with the Court having held that Austin has alleged a primary violation as to misstatements about the Tasiast schedule made on or after August 10, 2011, Austin's § 20(a) claims for this period may survive as well.  Thus, Austin's § 20(a) claims are dismissed against the Individual Defendants only to the same extent as its § 10(b) claims.

## CONCLUSION

For the reasons stated above:

1.  Austin's motion to strike is granted.  Exhibits 13, 16–18, 20–27, and 29–34 to the Giuffra Declaration are stricken from the record.

2.  Kinross's motion to dismiss for failure to state a claim is granted in part and denied in part.

a.  Austin's allegations of misstatements and omissions relating to Kinross's due diligence, and Austin's allegations of misstatements and omissions relating to the schedule for development of the Tasiast mine made before August 10, 2011, are dismissed for failure to state a claim, as against all defendants.

b.  Austin's allegations of misstatements and omissions relating to the publicly announced schedule for development of the Tasiast mine, made between August 10, 2011, and the end of the Class Period, state a claim, and are not dismissed, as against all defendants.

c. Austin's allegations of § 20(a) violations between August 10, 2011, and the end of the Class Period, state a claim, and are not dismissed, as against all four Individual Defendants.

The Court will hold a pretrial conference in this case on April 15, 2013, at 2:00 p.m., at which it will set a case management plan.  The Court directs counsel promptly to meet and confer as to such a plan, and, by April 5, 2013, to submit a joint letter proposing such a plan, or, to the extent the parties are unable to agree, alternative such plans.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: March 22, 2013
        New York, New York